# United States Court of Appeals

## For the First Circuit

_____

No. 98-1808

UNITED STATES,
Appellee,

v.

RAFAEL COLLAZO-APONTE,
a/k/a RAFI, a/k/a RAFAELITO,
Defendant, Appellant.

_____

No. 98-1933

UNITED STATES,
Appellee,

v.

HERIBERTO ORTIZ-SANTIAGO,
Defendant, Appellant.

_____

No. 98-1934

UNITED STATES,
Appellee,

v.

ANDRES COLON-MIRANDA,
Defendant, Appellant.

_____

No. 98-1935

UNITED STATES,
Appellee,

v.

EDWIN ORTIZ-FIGUEROA,
Defendant, Appellant.

_____

No. 98-1936

UNITED STATES,
Appellee,

v.

DAVID SAMUEL MARTINEZ-VELEZ,
Defendant, Appellant.

_____

No. 98-1937

UNITED STATES,
Appellee,

v.

JORGE MERCED-MORALES,
Defendant, Appellant.

_____

No. 98-1938

UNITED STATES,
Appellee,

v.

RAMON A. RIOS-RIOS,
Defendant, Appellant.

_____

No. 98-2116

-2-

UNITED STATES,
Appellee,

v.

EDWIN ROSARIO-RODRIGUEZ,
Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

_____

Before

Torruella, Chief Judge,

Wallace,* Senior Circuit Judge,

and O'Toole, Jr.,** District Judge.

_____

Rafael F. Castro-Lang, by appointment of the Court, for appellant Rafael Collazo-Aponte.
Kevin G. Little, by appointment of the Court, for appellant Heriberto Ortiz-Santiago.
Johnny Rivera-González, by appointment of the Court, for appellant Andrés Colón-Miranda.
Jorge L. Arroyo-Alejandro, by appointment of the Court, for appellant Edwin Ortiz-Figueroa.
Víctor P. Miranda-Corrada, by appointment of the Court, for appellant David S. Martínez-Vélez.
Ludwig Ortiz-Belaval for appellant Jorge Merced-Morales.
Linda Backiel for appellant Ramón A. Ríos-Ríos.
Rafael Anglada-López, by appointment of the Court, for appellant Edwin Rosario-Rodríguez.
Lena Watkins, Deputy Associate Chief, Litigation, Narcotic and Dangerous Drug Section, with whom Catherine Wingfield, and Grace Chung Becker, Trial Attorneys, Narcotic and Dangerous Drug Section, Criminal Division, U.S. Department of Justice, were on brief, for appellee.

_____

June 27, 2000

_____

* Of the Ninth Circuit, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

-4-

_____

**TORRUELLA, Chief Judge.** This appeal arises from a sixty-six count criminal indictment charging the eight appellants -- Rafael Collazo-Aponte, Heriberto Ortiz-Santiago, Andrés Colón-Miranda, Edwin Ortiz-Figueroa, David S. Martínez-Vélez, Jorge Merced-Morales, Ramón A. Ríos-Ríos, and Edwin Rosario-Rodríguez -- with numerous offenses related to a decade-long, multi-drug-dealing conspiracy based in the Virgilio Dávila public housing project in Bayamón, Puerto Rico. In addition to the drug conspiracy charges, the indictment also charged that between April 1993 and June 1994 over a dozen of the originally named co-conspirators engaged in a war of revenge, triggered by the February 23, 1993 murder of Richard Muñoz-Candelaria. This drug war resulted in the murder of at least seven individuals. On February 16, 1998, a jury returned guilty verdicts as to all appellants on all counts. This appeal followed.

After carefully examining the record and the law, we affirm in part and reverse and remand in part.

### PROCEDURAL HISTORY

On June 26, 1997, a grand jury empaneled in the United States District Court for the District of Puerto Rico returned a third superseding indictment in criminal case number 95-029(JAF). Count 1 charged appellants with conspiracy to possess with intent to distribute cocaine base, cocaine, and heroin. See 21 U.S.C. §§ 841, 846. Count 65 charged appellants with using and carrying a firearm during and in

relation to a drug conspiracy. See 18 U.S.C. § 924(c). Count 51 charged appellants Colón-Miranda, Ortiz-Santiago, Ortiz-Figueroa, and Martínez-Vélez with conspiring to kill while engaged in a drug conspiracy. See 21 U.S.C. §§ 846, 848(e)(1)(A). Additional counts charged appellants Rosario-Rodríguez (Count 52), Colón-Miranda (Counts 53-59 and 62), Ortiz-Santiago (Count 53), Ortiz-Figueroa (Count 53), and Martínez-Vélez (Counts 57 and 58) with intentionally killing or attempting to kill while engaged in a drug conspiracy. See 18 U.S.C. § 2; 21 U.S.C. §§ 846, 848(e)(1)(A). These charges also alleged liability pursuant to Pinkerton v. United States, 328 U.S. 640 (1946). Finally, Counts 60-64 charged Colón-Miranda with attempting to kill and then killing Rafael Cotto-Fuentes in order to prevent him from (1) communicating with law enforcement officers and (2) testifying for the prosecution. See 18 U.S.C. §§ 2, 1512(a)(1)(A), (C).

On November 5, 1997, the prosecution moved the district court to empanel an anonymous jury. On November 13, 1997, the court conducted a "Jury Orientation" without the parties or counsel being present and excused several prospective jurors. The court then granted the government's request for an anonymous jury over the objection of Colón-Miranda. Prior to trial, the court also denied motions to sever filed by appellants Ríos-Ríos and Collazo-Aponte.

Trial commenced on November 17, 1997. At that time, the district court ruled that all rulings applied to all defendants and

motions joining co-defendants' motions were unnecessary. The court also denied a motion to reconsider its decision to empanel an anonymous jury.

On February 16, 1998, the jury returned guilty verdicts as to all appellants on all counts. The court sentenced Ortiz-Santiago, Ortiz-Figueroa, and Martínez-Vélez to concurrent terms of life imprisonment on multiple counts and a consecutive ten-year term on Count 65; Colón-Miranda to concurrent terms of life imprisonment on multiple counts, a concurrent twenty-year term on Count 66, and a consecutive ten-year term on Count 65; Rosario-Rodríguez to concurrent terms of life imprisonment on Count 1 and twenty years on Count 52, as well as a consecutive ten-year term on Count 65; Collazo-Aponte, Ríos-Ríos, and Merced-Morales to 151, 293, and 360 months imprisonment, respectively, on Count 1 and, with respect to Collazo-Aponte and Merced-Morales, a consecutive ten-year term on Count 65.

## FACTUAL BACKGROUND

We review the facts in a criminal case in the light most favorable to the verdict. See, e.g., United States v. Bartelho, 71 F.3d 436, 438 (1st Cir. 1995).

## I. Overview

At trial, the prosecution offered evidence of a drug distribution organization led by Israel Santiago-Lugo that began in the Virgilio Dávila housing project in Bayamón, Puerto Rico, and later

-8-

expanded to several drug distribution points in northern Puerto Rico. The government's evidence included the testimony of five cooperating witnesses: brothers Wilfredo and David Martínez- Matta, Billy Ramos-Rodríguez, José Ibáñez-Maldonado, and Marcos Hidalgo-Meléndez. These witnesses testified that in the mid-1980s Santiago-Lugo cultivated a group of employees who processed and packaged cocaine and heroin at apartments, known as "mesas," for delivery to various drug distribution points. The evidence indicated that trusted operatives managed the distribution points and lower level employees handled the street-level distribution. On February 28, 1993, the Santiago-Lugo drug organization splintered into rival factions when the Rosario-Rodríguez brothers murdered Richard Muñoz-Candelaria. A series of retaliatory murders ensued as Santiago-Lugo and those loyal to him engaged in hunting expeditions ("cacerías") to kill the Rosarios.

## II. <u>Drug Packaging at the Mesas</u>

At trial, the witnesses for the prosecution testified as to their and the appellants' involvement in the Santiago-Lugo drug mesas. Wilfredo Martínez-Matta stated that in 1986 and 1987 he worked at two drug mesas located in hotels. At that time, he also packaged cocaine at his mother's house. Ramos-Rodríguez and David Martínez-Matta testified that they also packaged drugs at the Martínez-Matta house, and David Martínez-Matta stated that Santiago-Lugo, Colón-Miranda, and brothers Ortiz-Santiago and Ortiz-Figueroa participated.

Wilfredo Martínez-Matta and Ramos-Rodríguez testified that in 1989 a condominium in Reina del Mar served as a mesa. Hidalgo-Meléndez testified that Colón-Miranda, Ortiz-Santiago, and Ortiz-Figueroa packaged drugs there in the early 1990s. Wilfredo Martínez-Matta stated that he packaged cocaine there once in 1989, and further stated that Ortiz-Santiago, a drug user, "tested" drug quality at this location. Ramos-Rodríguez, who rented the Reina del Mar mesa for four to five months, indicated that the drug organization packaged one-eighth-kilogram quantities of cocaine at each session in the Reina del Mar mesa and that he or Santiago-Lugo would transport the drugs to Dávila for storage and distribution.

In the early 1990s, Wilfredo Martínez-Matta worked at two mesas in the Costa del Mar condominium complex. At these locations, he processed cocaine with Ramos-Rodríguez and heroin with Ríos-Ríos. Wilfredo Martínez-Matta also stated that (1) the organization packaged kilogram quantities of cocaine and one-eighth kilograms of heroin at each session and (2) Ríos-Ríos once obtained one kilogram of cocaine for Santiago-Lugo from a supplier. Ramos-Rodríguez recalled that the organization used the Costa del Mar mesas from 1990 to 1991, that he processed heroin and cocaine once or twice a week for four or five months there, and that he was paid $150 for each one-eighth kilogram of cocaine packaged. He added that Ortiz-Santiago delivered drugs to the

mesa, occasionally with Santiago-Lugo.  Ortiz-Santiago also processed drugs and tested their purity.

Wilfredo Martínez-Matta, David Martínez-Matta, and Ramos-Rodríguez also testified that Ríos-Ríos rented a mesa at the Los Pinos condominium complex in Isla Verde.  All three witnesses, in addition to Colón-Miranda, Ortiz-Santiago, Ortiz-Figueroa, and Ríos-Ríos, processed heroin there.  According to the testimony presented at trial, the organization processed quarter-kilogram quantities of heroin and kilogram quantities of cocaine there on a weekly basis.  Hidalgo-Meléndez also recalled packaging drugs at Los Pinos and once saw Ríos-Ríos deliver cocaine there.  Further, the rental agreements for the Los Pinos mesa indicated that Ríos-Ríos rented the apartment and listed Santiago-Lugo as his employer and reference.  Defense witness Marta Arrondo-Díaz, who owned the Los Pinos apartment, stated that she rented the apartment to Ríos-Ríos and Santiago-Lugo for a one year term in March 1991.

The trial testimony identified three additional mesas:  an apartment in Condado where Wilfredo Martínez-Matta worked with Ortiz-Santiago, a condominium in the Villa del Mar complex in Isla Verde, and a Coral Beach condominium rented by Colón-Miranda.  Wilfredo Martínez-Matta recalled seeing Santiago-Lugo, Colón-Miranda, Ramos-Rodríguez and others packaging heroin in bags marked with the name "cristal" at the Coral Beach condominium.  Ramos-Rodríguez testified that Santiago-Lugo

moved operations to the Coral Beach condominium in 1991.  There, Santiago-Lugo, Colón-Miranda, Ortiz-Santiago, and others packaged two or three ounces of heroin two or three times each week.

## III.  Drug Distribution Points

Wilfredo Martínez-Matta testified that by the time the drug operation was located at the Coral Beach mesa in 1991, the organization had drug points in Manatí, Vega Baja, Arecibo, Campo Alegre, and Sabana Seca.  Wilfredo Martínez-Matta worked at the Vega Baja drug point where he sold fifty packages of heroin every ten days; each package, obtained for $75 and sold for $100, contained ten "decks" of heroin.  Colón-Miranda and Richard Muñoz-Candelaria occasionally supervised the Vega Baja drug point.  Later, Wilfredo Martínez-Matta supervised a drug point in Manatí where he sold approximately one hundred packages of heroin every three days and also sold marijuana and vials of crack.

David Martínez-Matta supervised one of the Arecibo drug points where he sold heroin, cocaine, crack, and marijuana from 1991 to 1995.  He testified that Colón-Miranda would deliver the drugs for distribution.  He also stated that on two occasions he saw Colón-Miranda make deliveries to Luis Rosario-Rodríguez.

In 1990, José Ibáñez-Maldonado began to accompany Colón-Miranda on drug deliveries to the drug distribution points; later, Ibáñez-Maldonado also assisted with packaging drugs at Colón-Miranda's Dorado home and at a mesa in the King's Court condominium.

-12-

After the Santiago-Lugo/Rosario-Rodríguez conflict erupted in February 1993, the exchange of drugs and money moved from an apartment in the Dávila housing project to Merced-Morales' bar, "Chompa," in Monacillos. Both Wilfredo and David Martínez-Matta testified that on numerous occasions they delivered money there and obtained drugs from Merced-Morales and Collazo-Aponte, including kilogram quantities of crack.

## IV.  The Rosario-Rodríguez Brothers

The Rosario-Rodríguez brothers, Richard, Edwin, and Luis, controlled a drug distribution point at the Dávila housing project outside of Building 17. By mid-1991, the brothers were selling Santiago-Lugo's heroin. In August 1991, Santiago-Lugo granted the Rosario brothers exclusive distribution rights for his cocaine at Dávila.

Ramos-Rodríguez testified that Edwin Rosario-Rodríguez controlled the crack cocaine distribution at Dávila and was responsible for getting heroin to the street dealers. He further stated that during this time he saw Edwin Rosario-Rodríguez in possession of a firearm at Dávila. Similarly, Hidalgo-Meléndez testified that Edwin Rosario-Rodríguez went to Rosa Morales-Santiago's apartment to pick up drugs, and identified numerous drug transactions in the drug ledgers under Edwin's nickname "Indio."

By 1992, however, Edwin Rosario-Rodríguez' ability to run the drug point was in question, and Santiago-Lugo removed him from his position as a "point owner." Nevertheless, the Rosarios were still allowed to sell packages of heroin and cocaine. Hidalgo-Meléndez testified that the agreement between Santiago-Lugo and the Rosario brothers continued until February 28, 1993, when the Rosario brothers murdered Richard Muñoz-Candelaria.

The prosecution also offered evidence of the following incident involving Edwin Rosario-Rodríguez. On July 3, 1992, a police officer witnessed Edwin Rosario-Rodríguez holding a Calico pistol in the Dávila housing project. The officer followed him into Building 17. Edwin Rosario-Rodríguez discarded the weapon by the entrance, and the officer seized it. In the stairway, the officer also seized a white bag that had been carried by a second individual that contained transparent plastic vials commonly used to package crack cocaine. The bag field-tested positive for cocaine. Edwin Rosario-Rodríguez ran into an apartment with a metal door (the other apartments on the floor had wooden doors), and the officer heard the toilet flushing. The officer entered the apartment by using a balcony and later seized over $1,000 in cash.

## V. __Drug Ledgers__

Both Wilfredo and David Martínez-Matta testified about drug transactions at the Dávila apartment of Rosa Morales-Santiago. In his

testimony, Wilfredo Martínez-Matta stated that Morales-Santiago would count the heroin proceeds and record them in a notebook. Similarly, Hidalgo-Meléndez testified that Morales-Santiago recorded drug transactions in a black school notebook and, later, a brown notebook. After examining two notebooks seized from Morales-Santiago's Dávila apartment in 1991, Hidalgo-Meléndez stated that units marked "c" in the notebooks represented "cristal" and that each package contained ten bags of heroin. An expert witness testified that the notebooks were consistent with those kept by an illicit drug organization. He opined that the "product" was calculated in units and that the "c" units sold for $75. He noted that together the notebooks reflected sales of at least $3.5 million during one year.

## VI.  The Murder of Richard Muñoz-Candelaria

At trial, witnesses for the prosecution offered the following account of the February 28, 1993 murder of Richard Muñoz-Candelaria. Wilfredo Martínez-Matta testified that he, Muñoz-Candelaria, and an individual named Jerry were at the Rosario drug point in Dávila the day Muñoz-Candelaria was killed. Santiago-Lugo had sent Muñoz-Candelaria to inform "Liquio" (Luis Rosario-Rodríguez) that he wanted his heroin and his money back. Liquio was "upset" and told Muñoz-Candelaria to "forget about it." Edwin Rosario-Rodríguez was there, holding an automatic pistol. Colón-Miranda and a co-conspirator identified as "El Gato" arrived, and Colón-Miranda sent Wilfredo Martínez-Matta to

-15-

deliver some money to Santiago-Lugo. When Wilfredo arrived at Santiago-Lugo's house, Santiago-Lugo answered a ringing telephone. He heard gun shots over the telephone, and he ordered Wilfredo to return to the Rosario drug point. Santiago-Lugo then paged Wilfredo and directed him to pick up Colón-Miranda at a bus stop. When he arrived, Colón-Miranda told him that Liquio killed Muñoz-Candelaria.

Ramos-Rodríguez testified that he was in Dávila on the afternoon of the murder. He stated that he had declined to join Colón-Miranda and Muñoz-Candelaria when they went to talk to Liquio, going instead to his mother-in-law's apartment. There, he heard a gunshot, and then a few seconds later, he heard two different series of shots. He ran out onto a balcony, saw people running away, and heard some people shout, "Liquio killed him" and "whoever talks, I'll kill them."

Later that day, Colón-Miranda told David Martínez-Matta that El Gato and Muñoz-Candelaria were talking to Liquio. Muñoz-Candelaria attempted to hand Liquio his phone when Liquio started to shoot him. Colón-Miranda and El Gato did not have time to draw their weapons, so they ran away. At that time, "Indio" (Edwin Rosario-Rodríguez) came over to where Muñoz lay, and both Edwin and Luis Rosario-Rodríguez shot Muñoz-Candelaria again.

Officer Sánchez-Ramos testified that he found the victim lying on top of a cellular telephone that was still turned on. The autopsy report showed that Muñoz-Candelaria was shot twenty-nine times.

-16-

Blood and urine tests indicated the presence of alcohol, and urine and nasal swab tests were positive for cocaine and a cocaine metabolite. A forensics expert testified that the victim had been shot with two types of bullets, indicating that two guns were used in the murder.

After the murder, Colón-Miranda and Wilfredo Martínez-Matta attended the first of several meetings to discuss "going to war" over the Dávila drug point. At these meetings, members of the Santiago-Lugo organization discussed and planned cacerías to kill the Rosarios. At a second meeting in Isla Verde, Santiago-Lugo and Colón-Miranda prepared weapons for the cacerías.

## VII.   The Hunting Expeditions ("Cacerías")

### A.   The Murder of Reynaldo Pacheco-Aponte

At a subsequent meeting held in an apartment in Dorado, the Martínez-Matta brothers, Hidalgo-Meléndez, El Gato, Santiago-Lugo, and Colón-Miranda planned how they would enter Dávila and kill the Rosarios. During the meeting, Colón-Miranda telephoned Ortiz-Santiago, and it was agreed that Ortiz-Santiago and Ortiz-Figueroa would keep Colón-Miranda informed as to the Rosarios' precise location within Dávila.

On April 19, 1993, the group drove to Dávila after receiving a call from Ortiz-Santiago. Colón-Miranda and El Gato, armed with AR-15 rifles, entered the housing project through the back door of a business while the others drove into the complex. When they all

returned to their cars, and at a later meeting, Colón-Miranda talked about how he killed "El Pacheco." At the scene of the crime, law enforcement officers recovered 100 casings fired from AR-15 rifles.

A distressed resident informed an officer at the scene that "they ran off through Paradero 23" and "they had masks." He also said that one of those who ran off was injured and wearing white pants and a mask. The officer located Ortiz-Santiago and Ortiz-Figueroa walking together on a side street near the Paradero and arrested and searched them. Ortiz-Figueroa had a bag containing firearms and ammunition, a rock of heroin or cocaine, a cellular telephone, a glove, two masks, and a firearm on his person. The officer saw blood on one of the masks and on the clothes of Ortiz-Figueroa who appeared to have a hand injury.

Wilfredo Martínez-Matta was not at the cacería; instead, he was obtaining three pounds of marijuana from Merced-Morales' business. Some of those involved, however, later met at his house. There, Colón-Miranda admitted to participating in the hunt and El Gato admitted killing Pacheco-Aponte. At yet another meeting, the co-conspirators discussed David Martínez-Matta shooting haphazardly during the cacería and that, as a result, "Erick [Ortiz-Santiago] could not come out."

Hidalgo-Meléndez learned of the murder on the news. He was informed of the details at a meeting with Colón-Miranda and the Martínez-Matta brothers at the Las Villas apartments in Dorado.

-18-

Hidalgo-Meléndez testified, "[El Gato] was just like bragging about the way he had killed Pacheco and explaining, like, he sewed with bullets the person of Pacheco . . . ."  In addition, El Gato told Hidalgo-Meléndez that "Erick [Ortiz-Santiago] and his brother [Ortiz-Figueroa] had not been able to come downstairs from the building . . . because one of the persons that had entered the project to kill the Rosario brothers were shooting at them."

**B.    The Murders of Ricardo Rivera-Dide and Samuel Serrano-Bermúdez**

Wilfredo Martínez-Matta began the next cacería with Santiago-Lugo by driving through the Bayamón area armed and looking for the Rosarios.  After Colón-Miranda joined them, they found and followed Rivera-Dide and Serrano-Bermúdez, known associates of the Rosarios.  Wilfredo and Colón-Miranda shot and killed both men as they sat in a car.  Hidalgo-Meléndez testified that he later learned that Wilfredo had killed "Sammy" and Colón-Miranda had killed Sammy's passenger.

**C.    The Murders of Wilfredo Rivera-Rodríguez and Wilfredo Guzmán-Morales**

A third cacería occurred around Easter in 1994.  At that time, Ibáñez-Maldonado, Colón-Miranda, and Martínez-Vélez met at the King's Court mesa.  There, they planned a cacería in search of the Rosarios "because of the drug point war."  They drove a stolen white van to look for the Rosarios.  While driving, they came across two people on a motorcycle.  They recognized someone they were looking for,

-19-

and Colón-Miranda and someone else began shooting at the individuals on the motorcycle. Ibáñez-Maldonado testified that he had a Taurus 9mm firearm, Colón-Miranda had an AK-47 or an AR-15, and Martínez-Vélez had an M-14 that jammed. There were three other Taurus pistols in the van. After they shot the driver and the motorcycle crashed, Martínez-Vélez and Raúl Ortiz-Miranda exited the van and killed the victims. When a police scanner alerted them that the police were in pursuit, they fled to a mountainous area, abandoned the van, and hid some of the weapons under leaves. Ibáñez-Maldonado also testified that Martínez-Vélez had darker skin than Ortiz-Miranda and that Ortiz-Miranda was wearing a white cap.

A police officer was following the white van as it pursued the motorcycle. After driving over the crest of a hill, the officer saw the bikers on the ground being shot by a tall, dark person and a tall, white person with a cap. A second officer responded to the shooting incident and chased the white van, which he eventually found near a hill. The police found several firearms near the van and a cap. Officers also seized casings for AR-15 and 9mm firearms within the van.

## VIII. The Murder of Rafael Cotto-Fuentes

In 1994, Cotto-Fuentes was arrested for the murder of José Cruz-Rodríguez. He agreed to cooperate with authorities and was released on bond. At a meeting with Officer Rodríguez in late April or early May 1994, Cotto-Fuentes described the Santiago-Lugo drug

organization. His testimony linked Colón-Miranda to the organization's activities, including the Cruz-Rodríguez murder. Based on the information it received from Cotto-Fuentes, the Puerto Rico U.S. Attorney's Office initiated an investigation. Cotto-Fuentes subsequently reported that Colón-Miranda, among others, had tried to kill him on May 20. Based on Cotto-Fuentes' account of the attempted murder, a judge issued warrants for the arrest of Ortiz-Miranda, Colón-Miranda, and a co-conspirator. While Ortiz-Miranda was in custody, he and Colón-Miranda reviewed the complaint, and an officer heard Ortiz-Miranda comment that Cotto-Fuentes was a "snitch."

Cotto-Fuentes was murdered in June 1994. On July 27, 1994, Colón-Miranda was arrested. A forensics expert testified that the 9mm Taurus firearm seized from Colón-Miranda's vehicle at the time of his arrest had an obliterated serial number; its barrel had been hollowed out to prevent identifying marking from forming on the bullet; and its firing pin had been filed down to disguise markings. However, the gun still produced identifying marks on the casing from the breach face, which is located at the rear of the gun, and these marks matched the twenty-four shell casings recovered from the murder scene.

## IX. The Arrests of Martínez-Vélez, Collazo-Aponte, and Merced-Morales

On November 22, 1993, police officers stopped a stolen vehicle. The passengers fled, but the police arrested the driver,

Martínez-Vélez, and seized a loaded "submachine gun," two portable radios, and approximately $1,300 in currency.

On September 29, 1994, a police officer observed Collazo-Aponte standing beside a car. The officer announced himself, and Collazo-Aponte threw a bag containing more than 1,000 decks of heroin into the car. He later stated that the car was his.

At the time Merced-Morales was arrested, law enforcement officers seized a scale, small ziplock bags, and additional drug paraphernalia from his residence as well as a list of high-powered firearms from his vehicle.

### DISCUSSION

This case involves eight appellants, each raising a plethora of arguments. Not surprisingly, several arguments are raised by more than one appellant. Accordingly, in the interest of clarity, we have organized this opinion by issue and not by individual appellant. We begin with the arguments concerning pretrial motions and then proceed in a rough chronology through sentencing.

## I.  Severance of the Cases of Ríos-Ríos, Collazo-Aponte, and Merced-Morales

Severance motions made pursuant to Federal Rule of Criminal Procedure 14 are addressed to the sound discretion of the trial judge. This Court will interfere with the exercise of that discretion "only upon a demonstration of manifest abuse." United States v. Boylan, 898

F.2d 230, 246 (1st Cir. 1990); see also United States v. Cresta, 825

F.2d 538, 554 (1st Cir. 1987); Talavera v. Peña, 668 F.2d 625, 630 (1st

Cir. 1982). Accordingly, in order to prevail, appellants must "make a

strong showing of prejudice." Boylan, 898 F.2d at 246 (quoting United

States v. Porter, 764 F.2d 1, 12 (1st Cir. 1985)). In this context,

"prejudice means more than just a better chance of acquittal at a

separate trial." United States v. Martínez, 479 F.2d 824, 828 (1st

Cir. 1973). As we have previously stated:

> This is a difficult battle for a defendant to
> win. There is always some prejudice in any trial
> where more than one offense or offender are tried
> together -- but such "garden variety" prejudice,
> in and of itself, will not suffice. Even where
> large amounts of testimony are irrelevant to one
> defendant, or where one defendant's involvement
> in an overall agreement is far less than the
> involvement of others, we have been reluctant to
> secondguess severance denials.

Boylan, 898 F.2d at 246 (citations omitted); see also Cresta, 825 F.2d

at 554-55 ("[T]he fact that the defendant plays a minor role and that

a substantial portion of the evidence is not directly related to the

defendant, does not make it ' *automatically* unlawful to try him with

more important figures.'" (quoting United States v. Mahomud Rawwad, 807

F.2d 294, 295 (1st Cir. 1986)).

Here, Ríos-Ríos, Collazo-Aponte, and Merced-Morales contend

that they suffered prejudicial spillover from the murder evidence

presented in this case. We are well aware of the potential for

prejudice in a complicated conspiracy trial involving several defendants. See, e.g., United States v. Smolar, 557 F.2d 13, 21 (1st Cir. 1977); Gorin v. United States, 313 F.2d 641, 646 (1st Cir. 1963). Nonetheless, in this case we see "little beyond the type and degree of prejudice customary in virtually all high-profile trials of multiple defendants and charges." Boylan, 898 F.2d at 246. Here, as in Boylan, "[t]here is nothing to suggest that the number of defendants and charges was so large that the jury could not distinguish among them." Id.; see also United States v. Luna, 585 F.2d 1, 5 (1st Cir. 1978). Furthermore, the trial court gave appropriate limiting instructions as to the admissibility of evidence against particular defendants and as to the need to determine guilt on an individual basis. See United States v. Figueroa, 976 F.2d 1446, 1452 (1st Cir. 1992) ("[E]ven assuming some evidentiary spillover, any prejudice was minimized by the limiting instructions given before and after the closing arguments."); see also Boylan, 898 F.2d at 246; Smolar, 557 F.2d at 21.[1] Under these circumstances, we hold that appellants have failed to "make a strong showing of prejudice." Boylan, 898 F.2d at 246 (quoting Porter, 764

---

[1] At the outset of trial, the judge instructed the jury to separately consider "each charge and the evidence pertaining to it" and to "give separate and personal consideration to the case of each individual defendant." At the close of evidence, the judge reiterated these instructions and added, "your verdict on any counts to any defendant should not control your verdict on any other count or as to any other defendant."

F.2d at 12). Accordingly, the district court did not abuse its discretion in denying appellants' Rule 14 motion.

## II. The District Court's Jury Screening Procedure

On September 3, 1997, the trial judge stated that he intended to screen the jury outside the presence of the parties and counsel, as he did in the related case United States v. Candelaria-Silva, 166 F.3d 19, 31 (1st Cir. 1999). There, the prospective jurors completed questionnaires and the judge excused those who lacked English proficiency, suffered from medical problems, or had previously scheduled travel plans. See id. at 29-31. On November 13, 1997, the judge screened the jury panel assigned to this case. Between September 3 and November 13, appellants did not object or request reconsideration of the court's intention to screen the jury. However, on November 17, Rosario-Rodríguez and Ortiz-Figueroa did object and moved to quash the panel. The district court denied the motion.

In Candelaria-Silva, we stated, "[i]f a judge does no more than what a jury clerk is authorized to do in excusing jurors, that may raise an issue of allocation of court resources but does not raise an issue of impropriety." Id. at 31. Here, several appellants argue that the jury screening procedure violated their Fifth and Sixth Amendment rights, but they fail to provide the Court with any relevant citations to the record. In fact, appellants do not even allege that the district court improperly dismissed jurors. Accordingly, we hold that

-25-

<u>Candelaria-Silva</u> controls, and therefore appellants' argument is without merit.  <u>See</u> <u>id.</u>

## III. The District Court's Decision to Empanel an Anonymous Jury[2]

Ríos-Ríos alleges that the decision to empanel an anonymous jury constituted an abuse of discretion. We disagree. A district court may empanel an anonymous jury when "the interests of justice so require." 28 U.S.C. § 1863(b)(7). In this Circuit, we have held that an anonymous jury is "a permissible precaution where (1) there are strong grounds for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." United States v. DeLuca, 137 F.3d 24, 31 (1st Cir. 1997). Our review of this decision is not limited to "the evidence available at the time the anonymous empanelment occurred," but may include "all relevant evidence introduced at trial." Id.

---

[2] Martínez-Vélez argues that the district court failed to make individualized findings regarding the need for an anonymous jury, the jury may not have been anonymous to the government, and the combination of anonymity and the mid-trial dismissal of Juror 23 negated the presumption of innocence. As the government correctly points out, Martínez-Vélez did not raise these arguments before the district court. Accordingly, these arguments have been waived. See United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992) ("[A] party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court."); see also United States v. Figueroa, 818 F.2d 1020, 1025 (1st Cir. 1987) ("[A]n issue not presented to the trial court cannot be raised for the first time on appeal."); United States v. Argentine, 814 F.2d 783, 791 (1st Cir. 1987) (same); Nogueira v. United States, 683 F.2d 576, 580 (1st Cir. 1982) (same).

Here, the indictment charged several defendants with murder, all defendants with membership in a violent, sprawling drug conspiracy, and one defendant with intimidation and murder of a cooperating government witness. Under these circumstances, we hold that the record "affords sufficient foundation for empaneling an anonymous jury both as a prudent safety precaution and a means of ensuring unfettered performance of the factfinding function." Id.; see also United States v. Marrero-Ortiz, 160 F.3d 768, 776 (1st Cir. 1998).

Furthermore, the trial judge took adequate precautions to protect the defendants' rights. As he had done in the related case of Marrero-Ortiz, the trial judge "did not mention any threat to juror safety, but, rather, informed the jurors that they would remain anonymous during the trial because of publicity concerns. He then instructed the jury on the presumption of innocence, and periodically repeated that instruction as the trial progressed." Marrero-Ortiz, 160 F.3d at 776. Under these circumstances, the trial judge did not exceed the scope of his discretion when he empaneled an anonymous jury in this case.

## IV. Restriction on Sidebar Participation During Voir Dire

During voir dire, the trial judge restricted participation by defense counsel in sidebar conferences to "two of you at the most." Although counsel for Ortiz-Figueroa suggested that all attorneys participate by using headphones, trial counsel for appellants did not

object to the limitation.  Ríos-Ríos now argues that the restrictions

on sidebar participation during voir dire violated his right to be

present at every critical stage of the trial.  See Fed. R. Crim. P.

43(a).  We disagree.

This argument is controlled by United States v. Gagnon, 470

U.S. 522, 527 (1985).  There, the Supreme Court held:

> The mere occurrence of an ex parte conversation
> between a trial judge and a juror does not
> constitute a deprivation of any constitutional
> right.  The defense has no constitutional right
> to be present at every interaction between a
> judge and a juror, nor is there a constitutional
> right to have a court reporter transcribe every
> such communication.

Id. at 526 (quoting Rushen v. Spain, 464 U.S. 114, 125-26 (1983)

(Stevens, J., concurring)).  In addition, the Court stated:

> If a defendant is entitled under Rule 43 to
> attend certain "stages of the trial" which do not
> take place in open court, the defendant or his
> counsel must assert that right at the time;  they
> may not claim it for the first time on appeal
> from a sentence entered on a jury's verdict of
> "guilty."

Id. at 529.

In this case, Ríos-Ríos was restricted from full

participation in a limited number of sidebar conferences that occurred

during voir dire; in all other aspects, appellant was present at, and

fully participated in, his trial.  In addition, trial counsel did not

object to the restriction, and counsel subsequently exercised cause and

peremptory challenges without objecting that there was not enough information to make those decisions.  On these facts, we see no Rule 43 violation.

## V.  The Defense's Request to Use the Government's Witness List During Voir Dire

Ríos-Ríos alleges that the trial court abused its discretion in refusing the defense's request for disclosure of the prosecution's witnesses during voir dire.  This argument is meritless.  In this Circuit, the law is settled: "[T]here is no constitutional or statutory requirement that the identity of prosecution witnesses be disclosed before trial."  United States v. Bello-Pérez, 977 F.2d 664, 670 (1st Cir. 1992); see also United States v. Reis, 788 F.2d 54, 58 (1st Cir. 1986); United States v. Barrett, 766 F.2d 609, 617 (1st Cir. 1985).

## VI.  Juror 58's Previous Service in an Unrelated Trial

Ríos-Ríos also argues that Juror 58's previous service in an unrelated trial involving government witness Ibáñez-Maldonado resulted in bias. We see no merit in this argument. During Ibáñez-Maldonado's testimony, Juror 58 informed the trial judge of his service in a previous trial that ended in an acquittal of Ibáñez-Maldonado.  The judge then conducted voir dire outside the presence of the jury.  Juror 58 stated that he could serve impartially in this case and, although he had mentioned his prior service to his fellow jurors, he had not discussed the details of the case.  Upon further inquiry, the court determined that the prior case involved a drug charge unrelated to the Santiago-Lugo organization.  Exercising an abundance of caution, the trial judge queried the defense; defense counsel informed the court

that they did not want Juror 58 dismissed. The judge recalled the jurors and instructed them that Juror 58 had served in a previous case in which Ibáñez-Maldonado was accused, but that Juror 58 could participate in the present case. The judge emphasized that Juror 58 should not discuss the previous case with the jurors and that Juror 58 had to disregard the previous case in considering the present one.

We conclude that the trial judge's careful voir dire of Juror 58 was sufficient to assess his impartiality and the potential taint of the entire panel. Further, the judge carefully instructed the jury to disregard the juror's prior service. As we have previously held, "the trial judge is vested with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct actually occurred and whether it was prejudicial." United States v. Ortiz-Arrigoitía, 996 F.2d 436, 443 (1st Cir. 1993); see also Boylan, 898 F.2d at 258. Therefore, appellant's claim of bias fails.

**VII.  Statements Made by Co-Conspirator "El Gato" to Hidalgo-Meléndez**

Ortiz-Figueroa alleges that certain statements indicating his participation in the April 19, 1993 cacería that resulted in the murder of Pacheco-Aponte were inadmissible hearsay. The trial court admitted the statements pursuant to Fed. R. Evid. 801(d)(2)(E). This Court reviews that decision for plain error. See United States v. McCarthy, 961 F.2d 972, 977 (1st Cir. 1992).

Hearsay statements are inadmissible as a matter of law. See Fed. R. Evid. 801(c). However, pursuant to Rule 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. To invoke this evidentiary exception, the movant "must show by a preponderance of the evidence that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Sepúlveda, 15 F.3d 1161, 1180 (1st Cir. 1993); see also Bourjaily v. United States, 483 U.S. 171, 175-76 (1987). In other words, the trial court must conclude that (1) "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made," and (2) that "the statement was in furtherance of the conspiracy." United States v. McCarthy, 961 F.2d 972, 977 (1st Cir. 1992) (quoting United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977)).

In this case, several of the co-conspirators met at the Las Villas apartments in Dorado following the April 19, 1993 cacería. At that meeting, El Gato made several incriminating statements. Hidalgo-Meléndez testified that El Gato was "just like bragging about the way he had killed Pacheco and explaining, like, he sewed with bullets the person of Pacheco." El Gato also told Hidalgo-Meléndez that "Erick [Ortiz-Santiago] and his brother [Ortiz-Figueroa] had not been able to

-33-

come downstairs from the building . . . because one of the persons that had entered the project to kill the Rosario brothers were shooting at them."  The district court concluded that these statements were admissible pursuant to Fed. R. Evid. 801(d)(2)(E).  We agree.

First, the record contains ample evidence that (1) the cacerías were conducted in furtherance of the drug conspiracy, and (2) the declarant and Ortiz-Figueroa were members of that conspiracy when the hearsay statements were made.  Second, El Gato's information confirmed for Hidalgo-Meléndez what had transpired within the organization, who had participated in the cacería, and "the people that [he ran] a risk with."  As we have previously stated, "the reporting of significant events by one coconspirator to another advances the conspiracy."  Sepúlveda, 15 F.3d at 1180.  Accordingly, El Gato's statements were properly admitted into evidence.

Alternatively, we hold that any error in admitting El Gato's statements was harmless.  Ortiz-Figueroa was arrested as he fled the murder scene at Dávila.  At the time of his arrest, police seized a plethora of incriminating evidence, including a bag containing firearms and ammunition, a rock of heroin or cocaine, a cellular telephone, a glove, two masks, and a firearm he was carrying on his person.  Further, the record also contains co-conspirator and police testimony indicating Ortiz-Figueroa's participation in the cacería.  Accordingly,

we conclude that the outcome of the trial would have been the same regardless of whether El Gato's statements were admitted.

## VIII. Evidence Regarding Collazo-Aponte, Ortiz-Figueroa, and Ortiz-Santiago's Income Taxes

Appellants allege that the district court erroneously admitted income tax certificates for Collazo-Aponte, Ortiz-Figueroa, and Ortiz-Santiago. In support of their argument, appellants cite Fed. R. Evid. 401, 403, and 404(b). At trial, the prosecution argued that the absence of tax returns demonstrated the absence of legitimate income and, therefore, a motive for engaging in the drug conspiracy. The trial court agreed, ruling (1) the tax returns were relevant to determine if a defendant alleged to have drug trafficking income declared any legitimate income, and (2) the tax certificates did not concern the crime of failing to file tax returns. We review the district court's evidentiary rulings for abuse of discretion. See United States v. Houlihan, 92 F.3d 1271, 1297 (1st Cir. 1996); United States v. Rivera-Gómez, 67 F.3d 993, 997 (1st Cir. 1995).

Even if the trial court did err by admitting the tax certificates, we nonetheless conclude that, given the overwhelming proof of appellants' participation in the drug conspiracy, any error was harmless. See United States v. Sabatino, 943 F.2d 94, 98 (1st Cir. 1991); United States v. Rodríguez-Cardona, 924 F.2d 1148, 1152 (1st

Cir. 1991).  We therefore reject this argument without further discussion.

## IX.   **The Search of Merced-Morales' Residence**

Merced-Morales alleges that the trial court should have suppressed the evidence seized from his residence and vehicle because the arresting officers (1) did not knock and announce their presence before breaking the gate padlock, (2) entered his home after arresting him outside, and (3) obtained his consent to search under duress. Appellant's arguments are without merit.

The trial court conducted a mid-trial suppression hearing. At that time, the following evidence was presented.  Merced-Morales was arrested by a team of law enforcement officers led by DEA Special Agent German Blanco.  Agent Blanco testified that his officers took extra precautions when executing the arrest warrant for Merced-Morales due to the violent nature of the organization.  Specifically, the agents broke the padlock on the driveway entrance gate and entered the driveway without announcing their presence.  According to Agent Blanco, he believed this was necessary (1) to reduce the risk of a surprise attack by whoever might be in the house and (2) to reduce the likelihood that anyone in the house could flee.  After the officers proceeded to safer positions near the main entrance and the sides of the house, Agent Blanco began knocking on the main entrance gate and announced his presence.   When Merced-Morales came down the stairs inside the house,

-36-

Agent Blanco ordered him to open the gate and the wooden door behind it.

When Merced-Morales opened the door, the police team entered his residence and initiated a protective sweep. Contemporaneously, Agent Blanco advised Merced-Morales of his constitutional rights in Spanish, using DEA Form 13A. According to Agent Blanco's testimony, Merced-Morales stated that he understood his rights. Agent Blanco further testified that there were no guns aimed at Merced-Morales, the officers did not threaten him, and he did not appear to be under the influence of drugs or alcohol. Merced-Morales then verbally consented to a search of his residence, and he signed a written consent form in Spanish after both he read it and Agent Blanco read it to him. The officers then seized a revolver, drug paraphernalia, marijuana, and a list of firearms.

The defense presented contrary testimony. Merced-Morales' sister testified that the lock on the wooden front door was broken and there was damage to the door jamb following the arrest. She added that Merced-Morales had told her that the police entered the house by forcing open the front door. Merced-Morales testified that he was awakened by police pounding on his door. When he approached the door, police aimed a rifle at him through an open window, ordered him not to move, and then broke in through the door. Merced-Morales alleged he was then forced to sign a consent form at gunpoint and was informed

-37-

that the searches would proceed even if he refused to sign.  He further stated that as police officers escorted him out of the house, he saw that the doorlock and the edge of the door were broken.  On cross-examination, Merced-Morales testified that he had seen a crow bar and a sledgehammer only as officers returned them to a police vehicle and that the door showed no marks from a sledgehammer.

After hearing all of the evidence, the district court ruled that (1) the agents lawfully broke the padlock on the driveway gate due to exigent circumstances, namely the organization's known violence, (2) agents announced their presence as soon as their safety was less compromised, and (3) Merced-Morales opened his door with no breaking or entering by police.  While this Court reviews factual determinations supporting the denial of suppression motions for clear error, see United States v. Twomey, 884 F.2d 46, 51-52 (1st Cir. 1989), we review de novo whether exigent circumstances justify entry without notice, cf. United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995) ("[W]hether a particular set of circumstances gave rise to . . . 'exigent circumstances' is reviewed de novo and findings of fact are reviewed for clear error."); United States v. Gooch, 6 F.3d 673, 679 (9th Cir. 1993) ("We review de novo whether exigent circumstances justify a warrantless arrest or seizure."); United States v. Echegoyen, 799 F.2d 1271, 1277-78 (9th Cir. 1986) ("The ultimate issue of whether exigent circumstances justify a warrantless entry and/or search is resolved

-38-

under the *de novo* standard.").  "Where, as here, there are no explicit factual findings, the record below is assessed in the light most favorable to the trial court ruling."  Tibolt, 72 F.3d at 969.

First, we reject Merced-Morales' argument that the search of his residence and automobile was unlawful in light of the agents' failure to knock and announce.  The Supreme Court has held:

> [F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

Payton v. New York, 445 U.S. 573, 603 (1980); see also Steagald v. United States, 451 U.S. 204, 214 n.7, 221 (1981) ("Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.").  As a general rule, officers must give notice of their authority and purpose before entering private premises to make an arrest.  See Wilson v. Arkansas, 514 U.S. 927, 930 (1995) (holding common law knock-and-announce principle forms part of the Fourth Amendment reasonableness inquiry). However, the so-called knock-and-announce rule is not without its exceptions. Specifically, entry without notice to execute an arrest warrant is permissible when notice would jeopardize the safety of the officers.  See Ker v. California, 374 U.S. 23, 39-40 (1963) (holding Fourth Amendment not violated by failure to

-39-

announce where compliance would have increased officer's peril); cf. Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999) ("[T]hreat to police or the public safety is sufficient to create exigent circumstances." (internal quotation omitted)). In addition, we note that "the Supreme Court's standard of reasonableness [for Fourth Amendment purposes] is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." Roy v. Inhabitants of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994).

Accordingly, Agent Blanco and his officers had a right to enter Merced-Morales' residence in order to execute the warrant for his arrest. See Payton, 445 U.S. at 602-03; Steagald, 451 U.S. at 214 n.7, 221. Further, the officers knocked and announced their presence once they had obtained safe positions near the main entrance and the sides of the house. If the officers had announced their presence prior to entering the driveway gate, the officers would have been exposed to any threat emanating from the house. The record contains ample evidence that the officers knew Merced-Morales was a member of a well-armed and extremely violent drug organization. Under these circumstances, we hold that the authorities' failure to knock and announce prior to breaking the padlock on the driveway entrance gate was justified by exigent circumstances. See Ker, 374 U.S. at 39-40; see also Tibolt, 72

F.3d at 969 (stating exigent circumstances include situations posing a threat to police).

Next, we turn to Merced-Morales' contention that the police arrested him outside of his house. This version of events is contrary to Merced-Morales' testimony before the district court that the police broke down his door. Accordingly, this argument has been waived. "A litigant cannot jump from theory to theory like a bee buzzing from flower to flower. To the precise contrary, when a party fails to raise a theory at the district court level, that theory is generally regarded as forfeited and cannot be advanced on appeal." United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998); see also United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals.").

Finally, we affirm the district court's finding that the search of Merced-Morales' residence and vehicle was consensual. The voluntariness of consent is a question of fact determined by the totality of the circumstances. See United States v. Mendenhall, 446 U.S. 544, 557 (1980); Schneckloth v. Bustamonte, 412 U.S. 218, 226, 227 (1973); United States v. Barnett, 989 F.2d 546, 554 (1st Cir. 1993). Among other factors, a district court must consider "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under

-41-

inherently coercive circumstances." Barnett, 989 F.2d at 555; see also Schneckloth, 412 U.S. at 226; United States v. Twomey, 884 F.2d 46, 51-52 (1st Cir. 1989). "Although sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, see Schneckloth, 412 U.S. at 240, n.29, 'custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search.'" Barnett, 989 F.2d at 555 (quoting United States v. Watson, 423 U.S. 411, 424 (1976)). Here, Agent Blanco's testimony contradicted Merced-Morales' allegation of being coerced and held at gunpoint. The trial court observed both witnesses and determined that Agent Blanco's testimony was more credible. Where, as here, "there are two competing interpretations of the evidence, the district court's choice of one of them cannot be clearly erroneous." United States v. Cruz Jiménez, 894 F.2d 1, 7 (1st Cir. 1990); see also United States v. Zapata, 18 F.3d 971, 974 (1st Cir. 1994) (holding trial judge's denial of a suppression motion is entitled to considerable deference because he had opportunity to hear testimony, observe witness demeanor, and evaluate facts first hand). Accordingly, we conclude that appellant's arguments on this issue are without merit.

## X.  Evidence Seized at the Time of Merced-Morales' Arrest

Merced-Morales argues that the evidence seized at the time of his arrest should have been suppressed because:  (1) the drug

conspiracy ended in 1995 when certain members of the Santiago-Lugo organization were arrested, and therefore the evidence was inadmissable pursuant to Fed. R. Evid. 404(b); and (2) the risk of undue prejudice outweighed the probative value of the evidence pursuant to Fed. R. Evid. 403. We review for abuse of discretion. See Houlihan, 92 F.3d at 1297; Rivera-Gómez, 67 F.3d at 997. Finding no error, we affirm the ruling of the district court.

There is no evidence in the record that the drug conspiracy involved in this case ended prior to the arrest of Merced-Morales. The law on this question is settled: "Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated." E.g., United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993). Contrary to appellant's assertion, the arrest of some co-conspirators does not automatically terminate a conspiracy. See, e.g., United States v. Mealy, 851 F.2d 890, 901 (7th Cir. 1988) ("A co-conspirator's arrest does not automatically terminate a conspiracy; the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of their partners."); United States v. Thompson, 533 F.2d 1006, 1010 (6th Cir. 1976) (same).

In addition, there is no evidence in the record that Merced-Morales withdrew from the conspiracy prior to his arrest. "To withdraw, a conspirator must take some affirmative action 'either to

defeat or disavow the purposes of the conspiracy.'" <u>United States</u> v. <u>Muñoz</u>, 36 F.3d 1229, 1234 (1st Cir. 1994) (quoting <u>United States</u> v. <u>Juodakis</u>, 834 F.2d 1099, 1102 (1st Cir. 1987)).  Since the record does not indicate that Merced-Morales withdrew from the drug conspiracy, and since the drug paraphernalia and firearms list were consistent with his involvement in the conspiracy, the trial court did not err by admitting these items into evidence.

**XI.  <u>Withdrawal of the Firearm Seized From Merced-Morales' Vehicle</u>**

Merced-Morales argues that the trial court erred when it denied his motion for a mistrial.  Merced-Morales moved for a mistrial when the court withdrew from evidence a revolver seized from his vehicle at the time of his arrest.  We review a trial court's refusal to grant a mistrial for abuse of discretion; absent a clear showing of prejudice, we will uphold the lower court's ruling.  <u>See</u> <u>United States</u> v. <u>Zanghi, II</u>, 189 F.3d 71, 82 (1st Cir. 1999); <u>United States</u> v. <u>Gomes</u>, 177 F.3d 76, 82 (1st Cir. 1999).

We briefly review the facts relevant to this argument.  The police arrested Merced-Morales at his residence.  After the authorities had properly informed him of his constitutional rights, Merced-Morales consented to a search of his house and vehicle.  Pursuant to this search, the police seized a revolver.  At trial, the court initially admitted the weapon into evidence.  However, at the close of the prosecution's case, the trial judge requested additional information.

At that time, the prosecution requested that the firearm be withdrawn from evidence. The court agreed, and the trial judge reversed his prior admissibility ruling. Merced-Morales then moved for a mistrial, but the court denied the motion.

Before Merced-Morales' trial counsel began his deferred opening statement, the judge instructed the jury that rulings on the admissibility of evidence could change during the course of trial and that the jury could not consider excluded evidence. With respect to the revolver, the judge stated:

> [T]he gun will not be in evidence any further, since I have now found that the possession of this particular revolver is too remote in time to the conspiracy as to be related to the conspiracy . . . . [Y]ou cannot consider this gun as evidence, and I instruct you to disregard that particular revolver that was seized in his car at the time of his arrest.

We have previously stated that "[t]rials are expected to be fair, but not necessarily perfect; and appeals courts are slow to insist on mistrials, even in cases where [improper evidence] may actually convey prejudicial information." Gomes, 177 F.3d at 82. Where, as here, "a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice." United States v. Torres, 162 F.3d 6, 12 (1st Cir. 1998); see also United States v. Magana, 127 F.3d 1, 6 (1st Cir. 1997) ("Jurors are presumed to follow [curative] instructions, except in extreme cases.").

Here, the judge instructed the jury on the inadmissibility of the revolver prior to the deferred opening statement of counsel for Merced-Morales.  This allowed the jury to connect the judge's revised ruling on this one piece of evidence directly with Merced-Morales.  The revolver, moreover, has little significance: the record contains ample evidence of appellant's guilt, including the testimony of two cooperating eyewitnesses.  See Rivera-Gómez, 67 F.3d at 999 ("[T]he strength of the government's overall case is frequently a cardinal factor in evaluating the denial of a mistrial motion.").  Under these circumstances, we conclude that Merced-Morales has not demonstrated extreme prejudice, and therefore this argument fails.  See Torres, 162 F.3d at 12.

## XII.   Delayed Disclosure that a Government Witness Failed to Identify Ríos-Ríos in a Pre-Trial Photograph Array

Ríos-Ríos alleges that the district court should have sanctioned the prosecution for failing to timely disclose that Hidalgo-Meléndez failed to identify Ríos-Ríos in a pretrial photograph array. A district court's decision on how to handle delayed disclosure of Brady material is reviewed for abuse of discretion.  See United States v. Catano, 65 F.3d 219, 227 (1st Cir. 1995).

Prosecutors have an obligation to furnish exculpatory and impeachment information to the defense in a timely fashion.  See Brady v. Maryland, 373 U.S. 83, 87 (1963). Where the defense is confronted

not with complete suppression, but rather with delayed disclosure, "the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986); see also Catano, 65 F.3d at 227. In United States v. Ayres, 725 F.2d 806, 811 (1st Cir. 1984), we held that there was no prejudice when disclosure of a failed photograph identification attempt, although delayed, was sufficiently timely for cross-examination of the witness.

Here, Hidalgo-Meléndez testified that Ríos-Ríos was someone who once delivered cocaine to Santiago-Lugo. The day after this testimony was given, the prosecution belatedly disclosed that Hidalgo-Meléndez had failed to identify Ríos-Ríos in a pretrial photo array. The judge concluded that although the government should have informed Ríos-Ríos at the time of the in-court identification, it would not preclude the government from eliciting the information during Hidalgo-Meléndez's direct examination. Thereafter, the failed identification attempt was introduced first by the prosecution on direct examination, and then again by defense counsel on cross-examination. In addition, the judge instructed the jury that (1) a prior failure to identify was relevant to a witness' credibility, and (2) the prosecution had the burden of proving the identity of the defendant. Under these circumstances, we conclude that Ríos-Ríos cannot show prejudice from

the delayed disclosure.  Therefore, this argument fails.  <u>See</u>, <u>e.g.</u>,

<u>Ayres</u>, 725 F.2d at 811.

**XIII.    The Prosecution's Failure to Turn Over the Sworn Statement of Officer Burgos**

Ríos-Ríos alleges that the district court erred in concluding

that the prosecution had no obligation to turn over the sworn statement

of Officer Burgos.  The district court ruled that Officer Burgos' sworn

statement regarding Ortiz-Santiago's arrest was not discoverable as

Jencks Act material, <u>see</u> 18 U.S.C. § 3500, since the government could

not obtain it from the Commonwealth of Puerto Rico office that had

created and maintained it.  We see no error in this determination.

<u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Durham</u>, 941 F.2d 858, 861 (9th Cir. 1991)

("Under the Jencks Act, the prosecutor is required to disclose only

those statements which are in the possession of the United States.");

<u>United States</u> v. <u>Polizzi</u>, 801 F.2d 1543 (9th Cir. 1986) (same).

**XIV.  Cooperating Witness Instruction**

**A.    Merced-Morales' Argument**

Merced-Morales argues that the trial judge's decision not to

use his proposed jury instruction regarding the cooperating witnesses

Ibáñez-Maldonado, Ramos-Rodríguez, and Hidalgo-Meléndez violated his

right to a fair trial and due process of law.  The instruction proposed

by Merced-Morales stated:

> It is inappropriate to hold a defendant in prison
> for long periods of time pending sentencing while

> the government extracts information from him [because] this practice increases the likelihood that innocent individuals will be implicated by defendant trying to placate the government.

Merced-Morales did not object at the charge conference or after the judge instructed the jury.

In this Circuit, "[i]t is reversible error for the court to refuse a request to instruct as to defendant's theory of the case if there is evidence to support it." United States v. Thomas, 895 F.2d 51, 55 (1st Cir. 1990) (quoting United States v. Leach, 427 F.2d 1107, 1112-13 (1st Cir. 1970)). However, the refusal to give a particular requested instruction is reversible error only if "the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." United States v. Gibson, 726 F.2d 869, 874 (1st Cir. 1984) (quoting United States v. Grissom, 645 F.2d 461, 464 (5th Cir. 1981)). Consequently, "[t]he court need not give instructions in the form and language requested by the defendant." United States v. Morris, 700 F.2d 427, 433 (1st Cir. 1983).

With regard to testimony given by an accomplice, this Court has stated:

> It is well established that an accomplice is qualified to testify as long as any agreements he

has made with the government are presented to the jury and the judge gave complete and correct instructions detailing the special care the jury should take in assessing the testimony.

United States v. Hernández, 109 F.3d 13, 15 (1st Cir. 1997) (internal quotation omitted).

Here, the trial judge instructed the jury to examine the testimony of an alleged accomplice "who provides evidence against a defendant for personal advantage under a plea agreement . . . with greater care and caution than the testimony of an ordinary witness." The judge further instructed the jury (1) that they must consider such a witness's sentencing expectations and (2) that it is improper to convict any defendant "upon the unsupported testimony of such witness unless you believe the testimony beyond a reasonable doubt." We conclude that the judge properly instructed the jury on issues of credibility and reject appellant's allegation of error. See, e.g., Hernández, 109 F.3d at 15; Gibson, 726 F.2d at 874.

### B. Collazo-Aponte's Argument

Collazo-Aponte raises a closely related argument regarding the testimony of Wilfredo and David Martínez-Matta. Namely, Collazo-Aponte contends that the Martínez-Mattas' post-conviction cooperation agreements violated 18 U.S.C. § 201(c)(2), and therefore the district court should have excluded their testimony. This Court has squarely rejected this argument: "We hold, without serious question, that 18

-50-

U.S.C. § 201(c)(2) does not bar the government from promising leniency or the like to cooperating witnesses." United States v. Lara, 181 F.3d 183, 198 (1st Cir. 1999); see also United States v. Falú-González, 205 F.3d 436, 445 (1st Cir. 2000). Accordingly, the district court did not err in admitting the contested testimony.

## XV. Multiple Conspiracy Instruction

Collazo-Aponte and Merced-Morales allege that they suffered prejudice because the trial judge did not give a multiple conspiracies instruction. As appellants correctly indicate, this case involved two conspiracies -- the first was the drug conspiracy (Count 1), the second was the conspiracy to kill the Rosario-Rodríguez brothers (Count 51). Appellants were not charged in Count 51, and no evidence linked either Collazo-Aponte or Merced-Morales to the cacerías undertaken to kill the Rosario-Rodríguez brothers.

As we indicated above, "[i]t is reversible error for the court to refuse a request to instruct as to defendant's theory of the case if there is evidence to support it." Thomas, 895 F.2d at 55. However, "the defendant must tender an instruction that is appropriate in form and substance. Where he fails to accomplish this, the court is not obligated to give an instruction unless a particularly sensitive defense is involved, or the facts adduced at trial are so complex and confusing that an understanding of the issues would be beyond the grasp of the jury." Id.

Here, the record shows that neither Collazo-Aponte nor Merced-Morales proposed a multiple conspiracies instruction. Further, this is not a case involving "a particularly sensitive defense . . . or . . . issues . . . beyond the grasp of the jury." Id. Accordingly, "our review will be confined to determining whether the judge's omission to instruct on multiple conspiracies constituted plain error." Id. We stated in Thomas that "[t]he test for such error is whether there was a variance between the conspiracy charged in the indictment and the one implicating the defendant according to the evidence adduced at trial which prejudiced the substantial rights of the accused." Id. Under the test we formulated in Thomas, the essential inquiry "is whether the evidence is sufficient to permit a jury to find the agreement that the indictment charges." Id. at 56.

In this case, the record contains ample evidence of appellants' involvement in the drug conspiracy charged in Count 1. This evidence has no relation to the cacerías and is more than sufficient to convict appellants. In addition, the evidence involving the cacerías and the ensuing murders directly implicates appellants in the drug conspiracy. As the prosecution correctly indicates, the cacerías were initiated to restore and maintain the integrity of the drug conspiracy. Although the defendants who participated in the cacerías also reached an agreement to murder in violation of 21 U.S.C. § 848(e), those murders were inextricably linked to and committed in

-52-

furtherance of the drug conspiracy.  See United States v. Miller, 116
F.3d 641, 682 (2d Cir. 1997).  Finally, the judge appropriately
instructed the jury to separately consider each defendant's case.  See,
e.g., United States v. Brandon, 17 F.3d 409, 449 (1st Cir. 1994);
United States v. Boylan, 898 F.2d 230, 244 (1st Cir. 1990).  Under
these circumstances, we conclude that appellants have failed to
demonstrate any prejudice arising from the lower court's decision not
to give a multiple conspiracy instruction.

## XVI.  **Sufficiency of the Evidence**

In this Circuit, "[o]ne who challenges the sufficiency of the
evidence bears a heavy burden:  he must show that no rational jury
could have found him guilty beyond a reasonable doubt." United States
v. Rodríguez, 162 F.3d 135, 141 (1st Cir. 1998).  In evaluating a
sufficiency of the evidence claim, we review "the evidence as a whole,
in a light most favorable to the verdict, taking into consideration all
reasonable inferences." United States v. Scantleberry-Frank, 158 F.3d
612, 616 (1st Cir. 1998).  Further, "[w]e resolve all credibility
issues in favor of the verdict." Id.; see also United States v. Hahn,
17 F.3d 502, 506 (1st Cir. 1994); United States v. Batista-Polanco, 927
F.2d 14, 17 (1st Cir. 1991).  Accordingly, "[t]he evidence may be
entirely circumstantial, and need not exclude every hypothesis of
innocence; that is, the factfinder may decide among reasonable

interpretations of the evidence." <u>Scantleberry-Frank</u>, 158 F.3d at 616 (quoting <u>Batista-Polanco</u>, 927 F.2d at 17).

### A.  <u>Martínez-Vélez's Conviction on Count 1</u>

Martínez-Vélez alleges that there was insufficient evidence to support his conviction on Count 1.  Specifically, he argues that his participation in the 1994 Easter cacería that resulted in the murder of two motorcyclists did not establish his participation in the drug conspiracy.  In making this argument, Martínez-Vélez attacks the credibility of government witness Ibáñez-Maldonado.  We conclude that this argument is without merit.

"To prove a drug conspiracy charge under 21 U.S.C. § 846, the government is obliged to show beyond a reasonable doubt that a conspiracy existed and that a particular defendant agreed to participate in it, intending to commit the underlying substantive offense." <u>United States</u> v. <u>Sepúlveda</u>, 15 F.3d 1161, 1173 (1st Cir. 1993).  "Due to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either express or tacit and that a common purpose and plan may be inferred from a development and collocation of circumstances." <u>United States</u> v. <u>Sánchez</u>, 917 F.2d 607, 610 (1st Cir. 1990) (internal quotation omitted).  Accordingly, we have previously stated that "proof may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that

-54-

furthered the conspiracy's purposes." <u>United States</u> v. <u>Gómez-Pabón</u>, 911 F.2d 847, 853 (1st Cir. 1990).

Here, Ibáñez-Maldonado testified that Martínez-Vélez participated in the meeting at the King's Court mesa, the ensuing cacería, and the murder of the two motorcyclists in April of 1994. The evidence, consequently, shows that (1) appellant met with other conspirators at a Santiago-Lugo drug mesa, (2) appellant willingly joined members of the Santiago-Lugo organization in planning a cacería against the Rosario-Rodríguez brothers, and (3) during this cacería, appellant participated in killing two individuals who were members of a rival drug organization. As we have stated, the record contains abundant evidence that the cacerías were undertaken in order to regain control over the Dávila drug distribution point. Accordingly, we conclude that the jury could reasonably infer that Martínez-Vélez was a member of the Count 1 drug conspiracy and was prepared to kill to protect the conspiracy's interests. <u>See</u> <u>United States</u> v. <u>Mangual-Corchado</u>, 139 F.3d 34, 44 (1st Cir. 1998) ("[T]he jury is entitled to rely on a chain of reasonable inferences, as long as each constituent inference is rooted in the evidence."). In reaching this result, we note that "proof of direct participation in the sale of drugs is not required to convict in a drug conspiracy case." <u>United States</u> v. <u>Marrero-Ortiz</u>, 160 F.3d 768, 773 (1st Cir. 1998).

We also reject the challenge to Ibáñez-Maldonado's credibility. We have previously stated, "[c]redibility is not an issue for the appellate court." United States v. Aponte-Suárez, 905 F.2d 483, 489 (1st Cir. 1990). Here, Ibáñez-Maldonado's testimony, even if uncorroborated, was sufficient to support appellant's conviction because "it was not incredible or insubstantial on its face." Id. Accordingly, we conclude that Martínez-Vélez has failed to demonstrate that no rational jury could have found him guilty beyond a reasonable doubt.

### B. The Statute of Limitations Argument Raised by Ríos-Ríos

Ríos-Ríos alleges that the evidence adduced at trial established his involvement in the drug conspiracy only in 1990-91, which is outside the statute of limitations period. Ríos-Ríos did not raise this argument before the trial court. Consequently, this argument is waived. See United States v. Barnett, 989 F.2d 546, 554 (1st Cir. 1993) ("Issues not squarely raised in the district court will not be entertained on appeal."); United States v. Haggert, 980 F.2d 8, 10-11 (1st Cir. 1992) (collecting cases).

Even if this argument had been properly preserved for appeal, we see no merit in it. Martínez-Matta and Hidalgo-Meléndez testified that Ríos-Ríos participated in the drug conspiracy while it operated at the Costa del Mar and Los Pinos mesas in 1990 and 1991. There is no

evidence in the record that Ríos-Ríos subsequently withdrew from the conspiracy. Accordingly, this argument fails as a matter of law:

> A mere cessation of activity in furtherance of a conspiracy does not constitute withdrawal. To withdraw, a conspirator must take some affirmative action either to defeat or disavow the purposes of the conspiracy. Typically, we have required evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.

Muñoz, 36 F.3d at 1234 (quotations and citations omitted). Since Ríos-Ríos did not withdraw from the conspiracy, the statute of limitations did not begin to run. See United States v. Rogers, 102 F.3d 641, 644 (1st Cir. 1996).

### C. Rosario-Rodríguez's Motion for Judgment of Acquittal

Rosario-Rodríguez alleges that the district court erroneously denied his motion for judgment of acquittal because the evidence was insufficient to sustain his conviction for conspiracy to distribute narcotics. See 21 U.S.C. §§ 841, 846. We review the denial of a motion for judgment of acquittal de novo. See United States v. Hernández, 146 F.3d 30, 32 (1st Cir. 1998). Having carefully reviewed the record, we conclude that this argument is meritless.

First, the record is replete with evidence of Rosario-Rodríguez's role in controlling the crack cocaine distribution at the Dávila housing project. Second, his role in obtaining heroin for street dealers was established not only through the testimony of Ramos-

Rodríguez but also through the Santiago-Lugo drug ledgers. Third, Ramos-Rodríguez testified that Rosario-Rodríguez carried a firearm to protect the Dávila drug point. Finally, at the time of Rosario-Rodríguez's arrest, police seized from his person a Calico pistol, over $1,000 cash, and a bag filled with transparent vials which field-tested positive for cocaine.

As the prosecution indicates, this evidence is more than sufficient for a rational jury to find that (1) the charged conspiracy existed, (2) Rosario-Rodríguez agreed expressly or tacitly to participate in it, and (3) he had the requisite intent to possess narcotics with the intent to distribute. See Sepúlveda, 15 F.3d at 1173; Sánchez, 917 F.2d at 610.

### D. Colón-Miranda's Sufficiency of Evidence Claims

Colón-Miranda argues that there was insufficient evidence to establish the existence of a drug conspiracy, his participation in a drug conspiracy, or his participation in the Pacheco-Aponte or Cotto-Fuentes murders.[3] As we have already indicated, a sufficiency of the evidence claim is reviewed "in [the] light most favorable to the verdict, taking into consideration all reasonable inferences."

---

[3] Colón-Miranda also argues that the evidence was insufficient to convict him of murdering Muñoz-Candelaria and violating 21 U.S.C. § 848. The record indicates that he was not charged with either offense.

<u>Scantleberry-Frank</u>, 158 F.3d at 616.  Here, even a cursory examination of the record demonstrates that appellant's arguments are disingenuous.

First, there is ample evidence in the record of the Count 1 drug conspiracy.  Five co-conspirators described the Santiago-Lugo organization and its extensive drug processing, packaging, and distribution activities.  These witnesses gave a detailed account of the quantity of drugs involved, and one drug ledger established that sales totaled $3.5 million for a single year.  Second, the witnesses all testified that they worked with Colón-Miranda at various times during the conspiracy.  In addition, Wilfredo Martínez-Matta testified that Colón-Miranda rented the Coral Beach mesa, and Ramos-Rodríguez described Colón-Miranda as a supervisor of the organization.  Three other witnesses indicated that Colón-Miranda made armed deliveries of drugs to the distribution points.  Third, the testimony of Hidalgo-Meléndez, Wilfredo Martínez-Matta, and David Martínez-Matta contradicts Colón-Miranda's claim that he was not at the Pacheco-Aponte murder scene.  Finally, ballistic evidence established that the firearm found by the police in Colón-Miranda's car was the firearm used to kill Cotto-Fuentes.

### E.  Insufficiency of Evidence Arguments Raised by Ortiz-Figueroa and Ortiz-Santiago[4]

---

[4] Because the insufficiency of the evidence arguments raised by Ortiz-Figueroa and Ortiz-Santiago involve the same set of facts, we have elected to address these two arguments together.

Ortiz-Figueroa argues that there is insufficient evidence to uphold his conviction on Counts 51, 53, and 65. See 21 U.S.C. §§ 846, 848(e)(1)(A); 18 U.S.C. §§ 2, 924(c). Specifically, he states that no evidence linked him to the planning of the cacería that resulted in the murder of Pacheco-Aponte, and no evidence linked the firearms seized from him at the time of his arrest with the actual murder or the drug conspiracy.

Similarly, Ortiz-Santiago raises an insufficiency of the evidence argument against his conviction on Count 53. See 21 U.S.C. § 848(e)(1)(A); 18 U.S.C. § 2. He contends that (1) the Pacheco-Aponte murder was neither reasonably foreseeable nor in furtherance of the conspiracy to kill the Rosario-Rodríguez brothers, and consequently Pinkerton liability does not apply; and (2) the evidence did not show that he aided and abetted the Pacheco-Aponte murder because he did not assist with it or actively seek its occurrence. Neither appellant raises a colorable claim.

Hidalgo-Meléndez testified that Ortiz-Santiago spoke to Colón-Miranda by telephone while Colón-Miranda and other co-conspirators planned the cacería that resulted in the murder of Pacheco-Aponte. At that time, Ortiz-Santiago agreed that he and Ortiz-Figueroa would act as scouts, informing Colón-Miranda of the location of the Rosario-Rodríguez brothers "for the time that we were going to go into the housing project to kill them." This testimony was

-60-

partially corroborated by David Martínez-Matta.  Further testimony given by various government witnesses indicated that Ortiz-Santiago and Ortiz-Figueroa were present at the cacería and that fellow co-conspirator David Martínez-Matta mistakenly shot at them.  In addition, Ortiz-Santiago and Ortiz-Figueroa were arrested as they fled from the crime scene.  Appellants' clothing matched a bystander's description of the culprits, and the arresting officer seized firearms, ammunition, a cellular telephone, narcotics, and two masks (one stained with blood) from Ortiz-Figueroa.

Based on this evidence, Ortiz-Figueroa cannot show that "no rational jury could have found him guilty beyond a reasonable doubt."  Rodríguez, 162 F.3d at 141.  As we have already stated, "the factfinder may decide among reasonable interpretations of the evidence."  Scantleberry-Frank, 158 F.3d at 616 (quotation omitted).  Here, there is sufficient circumstantial evidence to raise a reasonable inference that Ortiz-Figueroa was a knowing and voluntary participant in the conspiracy to kill the Rosario-Rodríguez brothers.  See id.  Accordingly, we reject appellant's claim of mere presence and uphold his conviction on Count 51.  See, e.g., United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) ("The attendant circumstances tell the tale -- and the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement.  In other words, a defendant's 'mere presence' argument will fail in

situations where the 'mere' is lacking."); Batista-Polanco, 927 F.2d at 18 ("[I]t runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes.").

The evidence outlined above is equally conclusive as to both of these appellants' convictions on Count 53 for the murder of Pacheco-Aponte. While the government argues that aider and abettor liability is applicable, we rely on Pinkerton v. United States, 328 U.S. 640, 645-48 (1946). In Pinkerton, the Supreme Court held that a conspirator may be held vicariously liable for a substantive crime committed by a co-conspirator if that crime is reasonably foreseeable and committed in furtherance of the conspiracy. See id.; see also United States v. Shea, 150 F.3d 44, 50 (1st Cir. 1998); United States v. Tse, 135 F.3d 200, 206 (1st Cir. 1998); United States v. White, 116 F.3d 948, 951 (1st Cir. 1997).

Count 51 alleged an agreement to kill the Rosario-Rodríguez brothers "and other individuals whom the defendants herein believed to be associated with [them]." Ortiz-Santiago concedes his participation in the Count 51 conspiracy. And, as we have just concluded, there is sufficient circumstantial evidence to tie Ortiz-Figueroa to this conspiracy as well. The record, moreover, is conclusive that (1) the cacería that resulted in the murder of Pacheco-Aponte was undertaken to kill the Rosarios, (2) Ortiz-Santiago and Ortiz-Figueroa were present

-62-

and participated in this cacería, (3) the murder victim, Pacheco-Aponte, was an associate of the Rosarios, and (4) during the cacería, appellants and their co-conspirators were heavily armed. (Witnesses for the prosecution testified that some co-conspirators were armed with AR-15 rifles, and police responding to the scene recovered over 100 casings fired from AR-15 rifles.) Under these circumstances, a rational jury could conclude that the Pacheco-Aponte murder was reasonably foreseeable and committed in furtherance of the conspiracy to kill the Rosarios and their associates. Accordingly, we uphold appellants' convictions on Count 53.[5]

Finally, with respect to the 18 U.S.C. § 924(c) charge, the record reflects that (1) the cacerías were undertaken as part of the drug war over the Dávila drug distribution point, (2) Ortiz-Figueroa participated in the cacería that resulted in the murder of Pacheco-Aponte, and (3) Ortiz-Figueroa was arrested immediately after Pacheco-Aponte was murdered in the vicinity of the crime with multiple firearms on his person. Ortiz-Figueroa does not contest his possession of the firearms or challenge the sufficiency of the evidence linking him to the Count 1 drug conspiracy. Contrary to appellant's belief, it is irrelevant that the firearms in his possession were not used to kill

---

[5] We note that appellants' convictions for Count 53 could also be affirmed by applying Pinkerton liability to the Count 1 drug conspiracy. We need not determine whether the appellants could also be held guilty for aiding and abetting as the government urges.

Pacheco-Aponte.  It is enough that appellant carried the firearms during the cacería and therefore used the weapons in furtherance of the drug conspiracy.  See 18 U.S.C. § 924(c).  Accordingly, we affirm Ortiz-Figueroa's conviction under Count 65.

### F.  Merced-Morales and Collazo-Aponte's Sufficiency of the Evidence Arguments Regarding Pinkerton Liability under 18 U.S.C. § 924(c)

There is no dispute that Pinkerton liability may apply to a violation of 18 U.S.C. § 924(c).  See, e.g., United States v. Shea, 150 F.3d 44, 50 (1st Cir. 1998) ("Pinkerton liability attaches to the use-or-carrying-of-a-firearm offense proscribed in § 924(c).").  Merced-Morales, however, alleges that the district court erred in denying his Rule 29 motion on Count 65 because there is no evidence that he used or carried a firearm at any time or that a co-conspirator did so during Merced-Morales' membership in the conspiracy.  Similarly, Collazo-Aponte contends that there is no direct evidence that he possessed a firearm or was aware that any other co-conspirator used or carried a firearm.  Collazo-Aponte raises two additional arguments against his conviction on Count 65: (1) Pinkerton liability violates his due process rights because he was a minor participant in the drug conspiracy, and (2) the trial judge improperly instructed the jury on aiding and abetting as an alternative theory of liability.  Neither appellant raises a viable argument.

The record contains considerable evidence that both appellants belonged to the Santiago-Lugo drug conspiracy when other members of the organization carried firearms in furtherance of the conspiracy and that such conduct was reasonably foreseeable to appellants. First, Wilfredo Martínez-Matta testified that the organization began storing heroin and cocaine at Merced-Morales' bar when the Rosario conflict began in early 1993. The record is replete with evidence that various members of the organization were armed during the subsequent drug war that took place between May 19, 1993 and June 22, 1994. Second, both of the Martínez-Matta brothers testified that Merced-Morales was involved in routine drug deliveries and pickups. (Wilfredo also placed Merced-Morales at the bar with Santiago-Lugo on many occasions prior to the Rosario conflict and at the 1992 funeral of Santiago-Lugo's father.) Third, Wilfred Martínez-Matta testified that Collazo-Aponte was involved in various drug transactions that occasionally involved up to a kilogram of cocaine.

Unlike the stricter "practical certainty" standard applied in aider and abettor liability, under Pinkerton, the defendant need only have reasonably foreseen that one of his co-conspirators would use a firearm during the commission of the conspiracy. See Shea, 150 F.3d at 50. It is well settled that "the illegal drug industry is, to put it mildly, a dangerous, violent business." United States v. Díaz, 864 F.2d 544, 549 (7th Cir. 1988). As a corollary, the use of firearms is

foreseeable in trafficking offenses involving substantial quantities of drugs. See id.; United States v. Cummings, 937 F.2d 941, 945 (4th Cir. 1991).

In this case, there is no evidence that appellants were unaware of the quantities of drugs delivered to Merced-Morales' bar. In contrast, Wilfredo and David Martínez-Matta testified that both Merced-Morales and Collazo-Aponte were frequently involved in drug transactions involving, for example, kilogram quantities of cocaine and crack. Further, at the time of his arrest in September 1994, Collazo-Aponte possessed over 1,000 decks of heroin. (Wilfredo Martínez-Matta testified that ten decks of heroin sold for $100; therefore, the 1,000 decks Collazo-Aponte possessed would have sold for $10,000.) Accordingly, we hold that the use of firearms was foreseeable to the appellants, and we affirm their convictions on Count 65.[6]

In reaching this conclusion, we reject Collazo-Aponte's due process argument. We agree with appellant that "due process constrains the application of Pinkerton where the relationship between the defendant and the substantive offense is slight." United States v. Castañeda, 9 F.3d 761, 766 (9th Cir. 1993); see also United States v.

---

[6] We note that there is also sufficient evidence in the record to support a reasonable inference that both Merced-Morales and Collazo-Aponte were aware that the drug war with the Rosarios was the impetus behind the move to Merced-Morales' bar. For this reason as well, we affirm appellants' Count 65 conviction because it was foreseeable that firearms would be used to facilitate and protect the Santiago-Lugo drug operation during the drug war with the Rosarios.

<u>Chorman</u>, 910 F.2d 102, 112 (4th Cir. 1990); <u>United States</u> v. <u>Alvarez</u>, 755 F.2d 830, 850-51 (11th Cir. 1985); <u>United States</u> v. <u>Moreno</u>, 588 F.2d 490, 493 (5th Cir. 1979).  However, contrary to appellant's assertion, "[t]he foreseeability concept underlying <u>Pinkerton</u> is also the main concern underlying a possible due process violation." <u>Castañeda</u>, 9 F.3d at 766 (quoting <u>United States</u> v. <u>Christian</u>, 942 F.2d 363, 367 (6th Cir. 1991)).  Accordingly, the relevant inquiry is, "was it reasonably foreseeable to the defendant that a firearm would be used *in relation to the predicate offense*?"  <u>Id.</u> at 766.

In support of his argument, Collazo-Aponte relies on <u>United States</u> v. <u>Castañeda</u>.  In <u>Castañeda</u>, the Ninth Circuit reversed appellant Leticia Castañeda's conviction under 18 U.S.C. § 924(c) on due process grounds.  There, as here, the § 924(c) conviction was based on <u>Pinkerton</u> liability.  The court reasoned, "a conspirator may be held vicariously responsible for her co-conspirator's carrying of a firearm in relation to a specified drug trafficking offense," <u>id.</u> at 765, however, given the specific facts of the case, "we cannot conclude, without violating the fundamental precepts of due process, that Leticia could have foreseen the other conspirators' use of firearms in relation to the predicate offenses," <u>id.</u> at 768.  The court's analysis is informative.

> Where a defendant has little or no connection to
> the predicate drug offense, another conspirator's
> use of a firearm in relation to the predicate

drug offense may, in some fact situations, be unforeseeable. In those cases, it would violate due process to find the defendant vicariously liable for the firearm's use under § 924(c). Leticia's situation is a paradigm example of such an unforeseeable use.

As the sentencing court emphasized, Leticia played, at best, a small part in the overall conspiracy. The government contends, however, that six telephone conversations between Leticia and other conspirators demonstrate that she acted as her husband's "assistant" or "confidante" in the conspiracy. Not so. Although she was married to Uriel, a major player, there is no evidence that she played more than a passive role in the drug operation. . . .

Taken together, [the] phone calls demonstrate that Leticia "assisted" Uriel only insofar as she acted as his spouse: answering her home phone, taking messages from callers and answering his questions when he called. The evidence does not show that she knew much about Uriel's or Barron's organizations, that she knew the low-level distributors involved, that she had any knowledge of Angulo-López's organization, or that she ever had more than a marginal role in the conspiracy.

Id. at 767.

The dissimilarities between Castañeda and this case are readily apparent. Here, appellants were personally involved in numerous transactions involving large quantities of cocaine, crack, and other illegal drugs. Unlike Castañeda, this is not a case involving an attenuated relationship between the conspirator and the substantive crime. Accordingly, we hold that it was reasonably foreseeable to appellants that a firearm would be used in relation to the predicate

-68-

drug trafficking offense, see Díaz, 864 F.2d at 549, and reject Collazo-Aponte's due process argument, see, e.g., United States v. Johnson, 886 F.2d 1120, 1123 (9th Cir. 1989).

Finally, Collazo-Aponte alleges that the jury could have erroneously convicted him under an aiding and abetting theory. The trial judge instructed the jury as to Count 65 on two alternate theories of liability: aiding and abetting and Pinkerton co-conspirator liability. Contrary to appellant's assertion, it is settled that where there is insufficient evidence with respect to one theory of liability, the jury's verdict is presumed to rest on the theory that the evidence supported. See Griffin v. United States, 502 U.S. 46, 59 (1991); United States v. Nieves-Burgos, 62 F.3d 431, 434-35 (1st Cir. 1995). Since the evidence against Merced-Morales and Collazo-Aponte on the 18 U.S.C. § 924(c) charge is sufficient pursuant to Pinkerton, we affirm their convictions.

## XVII.  Rosario-Rodríguez's Double Jeopardy and Collateral Estoppel Arguments

Rosario-Rodríguez raises a double jeopardy challenge to his conviction based on his acquittal in United States v. Solano-Moreta, Cr. No. 95-160 (SEC).  The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  This guarantee is expressed, in pertinent part, as a prohibition against multiple prosecutions for the "same offense." United States v. Booth, 673 F.2d 27, 29 (1st Cir. 1982).  In the First Circuit, we examine five criteria to determine whether two conspiracies are the "same offense" for double jeopardy purposes: "(1) the time during which the activities occurred; (2) the persons involved in the conspiracies' (3) the places involved; (4) whether the same evidence was used to prove the two conspiracies; and (5) whether the same statutory provision was involved in both conspiracies." Id.; see also United States v. Hart, 933 F.2d 80, 85-6 (1st Cir. 1991); United States v. Gómez-Pabón, 911 F.2d 847, 860-61 (1st Cir. 1990).  Once a defendant has established a non-frivolous double jeopardy claim, the burden shifts to the government to prove by a preponderance of the evidence that the indictments charge separate offenses.  See Booth, 673 F.2d at 30-31.

Applying the Booth test here, we are satisfied that the narcotics conspiracy prosecuted in case 95-160 and the narcotics

conspiracy involved in this case are not the same offense.  First, the two conspiracies involve different time periods.  The indictment in this case alleges a conspiracy beginning in 1988, from which Rosario-Rodríguez withdrew by early 1993.  In contrast, in case 95-160, Rosario-Rodríguez was charged with participating in a drug conspiracy that existed at "divers[e] times between January 1, 1992 until on or about June 7, 1995."  Second, the participants were not the same.  Among the thirty-seven defendants in case 95-160 and the forty-nine defendants named in the various indictments in this case, only the Rosario-Rodríguez brothers are common to both.  Third, the evidence that the government used to prove each conspiracy was substantially different.  Most notable, not a single witness was common to both trials.  Although the location of both conspiracies and the statutory provisions charged, 21 U.S.C. §§ 841 and 846, were the same, this alone is not dispositive.  See, e.g., Hart, 933 F.2d at 85-86.  Accordingly, we hold that the conspiracies charged in each indictment are legally distinct and the prosecution in this case did not offend the Double Jeopardy Clause.

Rosario-Rodríguez also raises a collateral estoppel argument.  Collateral estoppel is a part of the Fifth Amendment's guarantee against double jeopardy.  It provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future

lawsuit." Ashe v. Swenson, 397 U.S. 436, 443 (1970). Although first developed in civil litigation, collateral estoppel is an "established rule of federal criminal law." Id. at 443. Further, the Supreme Court has stated that in criminal cases collateral estoppel is to be applied "with realism and rationality." Id. at 444.

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine that record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

Id. (internal quotations and citations omitted). The defendant bears the burden of demonstrating "that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." See Dowling v. United States, 493 U.S. 342, 350 (1990).

Here, Rosario-Rodríguez states that Count 1 of the indictment describes the individuals murdered after the Rosarios exited the Santiago-Lugo drug conspiracy as "associates of the Rosario-Rodríguez brothers." According to appellant, his acquittal in case 95-160 barred the government from alleging that he was "associated" with any of the

-72-

murder victims in this case.  This argument is not only confusing, but meritless.

Quite simply, there is no evidence indicating that the jury in case 95-160 concluded that appellant was not associated with the murder victims in this case.  To the contrary, as the record stands, there is nothing that even suggests that appellant's association with these individuals was at issue, let alone determined in appellant's favor, at the prior trial.  Equally important, the evidence attacked by appellant was not offered against him.  The government introduced evidence of Rosario-Rodríguez's association with certain murder victims to establish the motive of <u>other</u> defendants, who murdered those individuals because of their affiliation with the Rosario-Rodríguez brothers.  Consequently, appellant has not carried his burden of proof and this argument fails.

## XVIII. <u>Ortiz-Santiago, Rosario-Rodríguez, and Colón-Miranda's Double Jeopardy Argument</u>

Ortiz-Santiago, Rosario-Rodríguez, and Colón-Miranda argue that their convictions for the Count 1 drug conspiracy, charged pursuant to 21 U.S.C. § 846, and the drug-related murders, charged pursuant to 21 U.S.C. § 848(e), violate the Double Jeopardy Clause because the former is a lesser included offense of the latter. Appellants are mistaken.

In <u>Blockburger</u> v. <u>United States</u>, 284 U.S. 299, 304 (1932),

the Supreme Court set out the test for "separate offenses" under the

Double Jeopardy Clause, stating:

> The applicable rule is that, where the same act
> or transaction constitutes a violation of two
> distinct statutory provisions, the test to be
> applied to determine whether there are two
> offenses or only one is whether each provision
> requires proof of an additional fact which the
> other does not.

The Court, however, has clarified that "[t]he <u>Blockburger</u> test is a

'rule of statutory construction,' and because it serves as a means of

discerning congressional purpose *the rule should not be controlling*

*where, for example, there is a clear indication of contrary legislative*

*intent*." <u>Missouri</u> v. <u>Hunter</u>, 459 U.S. 359, 367 (1983) (quoting

<u>Albernaz</u> v. <u>United States</u>, 450 U.S. 333, 344 (1981)); <u>see also</u> <u>Garrett</u>

v. <u>United States</u>, 471 U.S. 773, 779 (1985) ("[T]he <u>Blockburger</u> rule is

not controlling when the legislative intent is clear from the face of

the statute or the legislative history."); <u>Albrecht</u> v. <u>United States</u>,

273 U.S. 1, 11 (1927) ("There is nothing in the Constitution which

prevents Congress from punishing separately each step leading to the

consummation of a transaction which it has power to prohibit and

punishing also the completed transaction.").

Here, Count 1 charged appellants with engaging in a drug

conspiracy under 21 U.S.C. § 846, which is punishable under 21 U.S.C.

§ 841(b)(1)(A). Counts 52-59 charged appellants with murder under 21

U.S.C. § 848(e)(1), which outlaws, in relevant part, intentional killing while engaged in an offense punishable under § 841(b)(1)(A). The statutory language of 21 U.S.C. § 848(e)(1) clearly indicates that a drug-related murder conviction is a separate offense from the predicate drug conspiracy offense:

> (1) In addition to the other penalties set forth in this section--
>
> (A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

21 U.S.C. § 848(e)(1). Significantly, the first sentence of § 848(e)(1) begins "[i]n addition to the other penalties set forth in this section," thereby making it clear that Congress intended to permit a defendant to be convicted and sentenced separately for murder under 848(e)(1) and a predicate drug conspiracy punishable under 21 U.S.C. § 841(b)(1)(A). The case law is in accord and we need not give this argument any further consideration. See United States v. McCullah, 76 F.3d 1087, 1104-05 (10th Cir. 1996); United States v. Snow, 48 F.3d 198, 200 (6th Cir. 1995); see also United States v. Villarreal, 963 F.2d 725, 728 (5th Cir. 1992) ("We are convinced that Congress created

-75-

a substantive offense in 21 U.S.C. § 848(e)(1)(B) and that its 'language, structure, and . . . history . . . show in the plainest way that Congress intended [it] to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses.'" (quoting Garrett, 471 U.S. at 779)); cf. United States v. NJB, 104 F.3d 630, 632-33 (4th Cir. 1997) (holding conviction for CCE murder, 21 U.S.C. § 848(e)(1), is a separate offense from a CCE, 21 U.S.C. § 848(c)).

**XIX.  Sentencing Arguments Raised by Ríos-Ríos Regarding His Base Offense Level and the Denial of a Mitigating Role Adjustment**

In the First Circuit, appellate review of a district court's application of the Sentencing Guidelines is a two-part process.  See United States v. Cali, 87 F.3d 571, 575 (1st Cir. 1996); United States v. Joyce, 70 F.3d 679, 681 (1st Cir. 1995).  First, we determine the applicability and interpretation of a sentencing guideline de novo.  See Cali, 87 F.3d at 575; United States v. McCarthy, 77 F.3d 522, 535 (1st Cir. 1996); United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992).  Second, after determining the guideline's scope and meaning, we review "the district court's factual determinations for clear error, 'giv[ing] due deference to the district court's application of the guidelines to the facts.'" Cali, 87 F.3d at 575 (quoting Joyce, 70 F.3d at 681); see also McCarthy, 77 F.3d at 535; St. Cyr, 977 F.2d at 701.

Here, Ríos-Ríos contends that the district court erred by (1) failing to make individualized findings regarding the drug quantity attributed to him, (2) incorrectly calculating the drug quantity, and (3) failing to apply Sentencing Guidelines § 2D1.1 comment note 14 and § 3B1.2 to his case.  These arguments are without merit.

In a drug distribution case, "a key datum in constructing a defendant's sentence is the quantity of narcotics attributable to him for sentencing purposes . . . ." United States v. Bradley, 917 F.2d 601, 604 (1st Cir. 1990); see also United States v. García, 954 F.2d

12, 15 (1st Cir. 1992).  In the context of a drug conspiracy, a defendant is also accountable for the conduct of others if that conduct is (1) reasonably foreseeable to the defendant and (2) committed in furtherance of a jointly undertaken criminal activity.  See U.S.S.G. § 1B1.3(a)(1)(B); see also United States v. O'Campo, 973 F.2d 1015, 1026 (1st Cir. 1992) ("We are of the view that the base offense level of a co-conspirator at sentencing should reflect only the quantity of drugs he reasonably foresees it is the object of the conspiracy to distribute after he joins the conspiracy."); García, 954 F.2d at 15 (same).  As a corollary, we have held that in order to properly calculate a defendant's base level for sentencing, a trial judge must make individualized findings regarding the foreseeability of conduct undertaken by co-conspirators.  See, e.g., United States v. Balogun, 989 F.2d 20, 22 (1st Cir. 1993).

In this case, the evidence established that Ríos-Ríos was actively involved in the Costa del Mar and Los Pinos mesas for approximately eighteen months during 1990 and 1991.  As a matter of law, Ríos-Ríos is accountable for his co-conspirators' conduct during that time so long as that conduct was reasonably foreseeable and in furtherance of the conspiracy.  See U.S.S.G. § 1B1.3(a)(1)(B); O'Campo, 973 F.2d at 1026; García, 954 F.2d at 15.  In sentencing Ríos-Ríos, the trial court determined that the conduct of his co-conspirators was reasonably foreseeable, stating those who were "dealing with the mesas,

-78-

taking care of the apartments, renting places, people who were in the trust of Santiago-Lugo, in that sense are responsible for that amount of drug."  The trial court then relied on the various drug ledgers deciphered by Agent Clouse at trial as a "conservative way of determining how much drug is involved," and concluded that Ríos-Ríos was subject to a base offense level of thirty-eight.

The district court's findings are not clearly erroneous. See Cali, 87 F.3d at 575.  To the contrary, there is ample evidence in the record to support the trial court's determination of a base offense level of thirty-eight.  David Martínez-Matta testified that the Santiago-Lugo organization processed quarter-kilogram quantities of heroin and kilogram quantities of cocaine at the Los Pinos mesa weekly. Over a one-year period, that would result in thirteen kilograms of heroin and fifty-two kilograms of cocaine.  The Sentencing Guidelines convert heroin and cocaine quantities to marijuana equivalents.  See U.S.S.G. § 2D1.1 cmt. note 10.  Pursuant to the drug equivalence tables, one gram of heroin equals one kilogram of marijuana and one gram of cocaine equals two hundred grams of marijuana.  Accordingly, during 1991, the Santiago-Lugo organization processed the equivalent of 23,400 kilograms of marijuana at the Los Pinos mesa (13,000 kilograms attributable to the heroin production and 10,400 kilograms attributable to the cocaine).  Ríos-Ríos actively participated in the mesas at Costa del Mar and Los Pinos for eighteen months, which makes him accountable

for a year and a half's worth of narcotics production amounting to the equivalent of 35,100 kilograms of marijuana. The prosecution needed only to show that the defendant was responsible for 30,000 kilograms of marijuana to support a base level of thirty-eight.

In addition, the trial court properly declined to apply Sentencing Guidelines §§ 2D1.1 comment note 14 and 3B1.2 to this case. Application Note 14, authorizing a downward departure for certain less culpable defendants, is dependent on the applicability of § 3B1.2, authorizing an offense level reduction for mitigating role. The burden to show that the facts merit the adjustment falls on the defendant. See García, 954 F.2d at 18 ("[W]hen a defendant seeks to show that his role was so tangential as to justify a downward adjustment in an otherwise-applicable offense level, he must carry the devoir of persuasion."). Moreover, we have often held, and today reaffirm, that role-in-the-offense determinations, if based on reasonable inferences drawn from undisputed facts, cannot be clearly erroneous. See, e.g., id. at 18; United States v. DiIorio, 948 F.2d 1, 5 (1st Cir. 1991); United States v. Rosado-Sierra, 938 F.2d 1, 1-2 (1st Cir. 1991).

In this case, the judge ruled, "from the evidence I have heard, . . . those who had access to [the mesas], indeed were by no means minor, minimal, or in between participants." There is no dispute that Ríos-Ríos had access to the drug mesas. Accordingly, we reject

appellant's argument that he played a minor role and affirm his sentence of 293 months.

## XX. Sentencing Argument Raised by Collazo-Aponte Regarding Enhancement of His Sentence Pursuant to 18 U.S.C. § 924(c)(1)(B)(i)

Collazo-Aponte alleges that the district court improperly enhanced his sentence for Count 65 (charging appellant with use of a firearm during a drug trafficking offense pursuant to 18 U.S.C. § 924(c)(1) and Pinkerton) to ten years pursuant to 18 U.S.C. § 924(c)(1)(B)(i).  The statute provides, in relevant part:

> (c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> . . . .
>
> (B) If the firearm possessed by a person convicted of a violation of this subsection--
>
> (i) is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years.

Id. § 924(c).  Appellant argues that (1) the use or carrying of semiautomatic firearms occurred prior to his joining of the conspiracy,

and (2) he could not have foreseen the use of such firearms. Neither argument has merit.

In the sentencing context, "we review factbound matters for clear error, and such facts need only be supported by a preponderance of the evidence." United States v. McCarthy, 77 F.3d 522, 535 (1st Cir. 1996); see also United States v. Andújar, 49 F.3d 16, 25 (1st Cir. 1995). Here, a preponderance of the evidence establishes that Collazo-Aponte joined the conspiracy shortly after the murder of Richard Muñoz-Candelaria, who was killed on February 23, 1993. At that time, the organization began storing drugs at Merced-Morales' bar. Collazo-Aponte does not contest that he was employed by Merced-Morales at this location, and Wilfredo Martínez-Matta testified that Collazo-Aponte was personally involved with the drug trafficking that took place there. Collazo-Aponte also does not contest that the evidence presented by the government at his sentencing reflected the organization's use of semiautomatic firearms during the Easter 1994 cacería that resulted in the murder of Wilfredo Rivera-Rodríguez and Wilfredo Guzmán-Morales. Consequently, appellant's first argument fails because the record reveals no clear error.

Collazo-Aponte failed to raise his reasonable foreseeability argument before the district court, and therefore appellant's second argument is waived. See, e.g., United States v. Candelaria-Silva, 166 F.3d 19, 40-41 (1st Cir. 1999); United States v. Barnett, 989 F.2d 546,

554 (1st Cir. 1993). Moreover, even if this argument had been properly preserved, the record contains ample evidence that the use of semiautomatic weapons was reasonably foreseeable. Collazo-Aponte had personal knowledge of the significant drug quantities involved in the conspiracy, see, e.g., United States v. Díaz, 864 F.2d 544, 549 (7th Cir. 1988), and it stretches the imagination to suggest that Collazo-Aponte was somehow unaware of the drug war with the Rosarios. Accordingly, this argument fails.

## XXI.  Sentencing Arguments Raised by Rosario-Rodríguez

### A.  Criminal History

Rosario-Rodríguez alleges that the district court improperly calculated his criminal history category pursuant to Sentencing Guidelines § 4A1.2 because the court treated his local convictions for first-degree murder and the related firearms offenses committed on April 2, 1994 as a "prior sentence." Appellant argues that contrary to the district court's determination, these convictions constitute conduct that is part of the instant offense pursuant to the definition of relevant conduct contained in Sentencing Guidelines § 1B1.3. Appellant is mistaken.

Section 4A1.2(a)(1) states that in calculating a defendant's prior criminal history a judge may count as a "prior sentence" only a "sentence previously imposed . . . for conduct not part of the instant offense." (Emphasis added). Conduct that is part of the instant

-84-

offense "means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3" U.S.S.G. § 4A1.2 cmt. note 1. Unfortunately, the applicable definition found in § 1B1.3 is not a model of clarity. Section 1B1.3 defines relevant conduct as "the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); see also United States v. Skrodzki, 9 F.3d 198, 201 (1st Cir. 1993). Thankfully, the commentary to § 1B1.3 is more helpful:

> (A) Common scheme or plan. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. . . .
>
> (B) Same course of conduct. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

U.S.S.G. § 1B1.3 cmt. note 9.

The case law is in accord, adopting a "severable and distinct test." See, e.g., Unites States v. Copeland, 45 F.3d 254, 256 (8th

-85-

Cir. 1995) ("Although conduct that is part of the current offense should be counted as relevant conduct rather than as a prior sentence, conduct is not part of the instant offense when it is a 'severable distinct offense.'") (quoting United States v. Blumberg, 961 F.2d 787, 792 (8th Cir. 1992). As the Guidelines indicate, "[t]his is necessarily a fact-specific inquiry that involves more than just a consideration of the elements of the two offenses. Factors such as the temporal and geographical proximity of the two offenses, common victims, and a common criminal plan or intent also must be considered." United States v. Beddow, 957 F.2d 1330, 1338 (6th Cir. 1992) (internal citation omitted).

Here, the district court properly concluded that Rosario-Rodríguez exited the Santiago-Lugo conspiracy on February 28, 1993 by taking part in the murder of Richard Muñoz-Candelaria. Consequently, appellant's local convictions for murder and the related firearms offenses do not constitute relevant conduct for sentencing purposes in this case. First, the local offenses occurred on April 2, 1994, more than a year after Rosario-Rodríguez exited the conspiracy charged in the present indictment. Second, although appellant claims that the 1994 murder was "relevant conduct" of his participation in the Santiago-Lugo organization, there was no evidence of the 1994 murder presented during trial. Third, appellant fails to provide the Court with any details of the 1994 murder. We are left to speculate as to

both the circumstances involved and the identity of the victim.  The little information about this murder that is in the record merely suggests that it was a double murder committed to avenge the execution of appellant's fourteen-year-old brother.  Accordingly, there is no evidence of common victims, accomplices, criminal plans or intent.  <u>See Copeland</u>, 45 F.3d at 256; <u>Beddow</u>, 957 F.2d at 1338.  Therefore, we hold that the district court did not err in finding the 1994 murder was not relevant conduct to the instant offense.

## B. **Downward Departure for Superb Prison Behavior**

Rosario-Rodríguez argues that the district court should have departed downward, pursuant to Sentencing Guidelines § 5K2.0, because of his "superb prison behavior" during prior and ongoing periods of incarceration. In United States v. Saldaña, 109 F.3d 100 (1st Cir. 1997), we explained:

> Under 18 U.S.C. § 3742(a), a defendant may appeal from his sentence . . . if it was imposed "in violation of law" or by "an incorrect application of the sentencing guidelines"; but the defendant may not appeal from a sentence within the guideline range if there was no legal error and the only claim is that the district court acted unreasonably in declining to depart.

Id. at 102; see also United States v. Tucker, 892 F.2d 8, 10 (1st Cir. 1989). Here, appellant does not allege any error of law. Accordingly, this claim is not subject to review.

## C. **Consecutive Sentences**

Rosario-Rodríguez alleges that the district court should have "exercised its discretion" under 18 U.S.C. § 3584(a) and Sentencing Guidelines § 5G1.3(c) to run his sentence in this case concurrent to that imposed for his local first-degree murder and related firearms convictions.

The applicable statute, 18 U.S.C. § 3584(a), states:

> [I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively . . . .

> Multiple terms of imprisonment imposed at
> different times run consecutively unless the
> court orders that the terms are to run
> concurrently.

Since the district court did not specify concurrent sentences, the terms of appellant's federal and local convictions run consecutively pursuant to the last sentence of Section 3584(a).

As Sentencing Guidelines § 5G1.3(c) makes clear, and as Rosario-Rodríguez admits, the district court has "full discretion" to decide whether to run the sentences concurrently or consecutively:

> [T]he sentence for the instant offense may be
> imposed to run concurrently, partially
> concurrently, or consecutively to the prior
> undischarged term of imprisonment to achieve a
> reasonable punishment for the instant offense.

U.S.S.G. § 5G1.3(c). Appellant does not allege any error of law, but merely contends that the court should have exercised its discretion differently. For the reasons set forth above, this argument is not subject to review. See Saldaña, 109 F.3d at 102 ("Under 18 U.S.C. § 3742(a), a defendant . . . may not appeal from a sentence within the guideline range if there was no legal error and the only claim is that the district court acted unreasonably in declining to depart."); Tucker, 892 F.2d at 10 (same).

### D. Acceptance of Responsibility

In light of his allocution at the sentencing hearing, Rosario-Rodríguez argues that the trial court erred in declining to

reduce his offense level for acceptance of responsibility pursuant to Sentencing Guidelines § 3E1.1(a).  In this Circuit, "[a] defendant bears the burden of proving entitlement to decreases in the offense level, including downward adjustments for acceptance of responsibility."  United States v. Gonzáles, 12 F.3d 298, 300 (1st Cir. 1993); see also United States v. Morillo, 8 F.3d 864, 871 (1st Cir. 1993); United States v. Bradley, 917 F.2d 601, 606 (1st Cir. 1990). "Whether a defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility is a fact-dominated issue, and the district court's decision to withhold a reduction in the offense level will not be overturned unless clearly erroneous."  E.g., United States v. Royer, 895 F.2d 28, 29 (1st Cir. 1990); see also U.S.S.G. § 3E1.1 cmt. note 5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.  For this reason, the determination of the sentencing judge is entitled to great deference on review.").

Section 3E1.1 requires a defendant to "clearly" demonstrate acceptance of responsibility for his offense.  Accordingly, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."  U.S.S.G. § 3E1.1 cmt. note 1(a). Although a defendant who goes to trial may still qualify for acceptance of responsibility, such an occurrence is "rare."  Id. at cmt. note 2.

The Guidelines explain: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. note 2. Accordingly, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." Id.

In this case, the record reflects that Rosario-Rodríguez made no pretrial statements accepting responsibility. Further, although appellant talked at length about his distribution of narcotics at his sentencing hearing, he did not accept responsibility for the murder of Muñoz-Candelaria. To the contrary, he stated:

> [T]he only reason I went to trial in this case was because I was being charged with the death of Richard Muñoz-Candelaria . . . . I would have accepted my responsibilities but I could never accept that I killed Richard Muñoz-Candelaria. I could never accept something that was not true.

Based on these statements, the district court correctly found:

> What I am saying is that the jury made a finding that your client participated in the murder. There has been no admission. No acceptance of responsibility by your client as to that and that is at odds with the evidence at trial and the jury verdict. In which case I don't think that I should second guess what happened in the jury room or how the jury interpreted the evidence by granting an acceptance of responsibility . . . .

As the trial court indicated, the record reflects that Rosario-Rodríguez denied murdering Muñoz-Candelaria in direct contravention of the jury's verdict on Count 52. Accordingly, we see no reason to reverse the lower court's determination on this question.

> [T]he district judge had firsthand knowledge of the circumstances surrounding the defendant's actions and had the opportunity to see [the defendant], listen to him, and assess his credibility. The judge determined that appellant had not forthrightly acknowledged the extent of his involvement and thus had failed meaningfully to shoulder responsibility. Because the court had a plausible basis for arriving at the conclusion, no more was required.

United States v. Royer, 895 F.2d 28, 30 (1st Cir. 1990).

### E. Credit for Time Served

Rosario-Rodríguez alleges that he should have received credit for time served on a previous federal sentence pursuant to 18 U.S.C. § 3585(b). Appellant's previous sentence was for possession of a firearm with an obliterated serial number. According to appellant, this offense was "inextricably related and inextricably intertwined" with the offenses in this case. The Supreme Court has disposed of this argument

> We do not accept [appellant's] argument that § 3585(b) authorizes a district court to award credit at sentencing . . . . Congress has indicated that computation of the credit must occur after the defendant begins his sentence. A district court, therefore, cannot apply § 3585(b) at sentencing.

<u>United States</u> v. <u>Wilson</u>, 503 U.S. 329, 333 (1992). The computation of credit for time served must be made in the first instance by the Attorney General, through the Bureau of Prisons. <u>See</u> <u>id.</u> at 335. Prisoners may then seek administrative review of the computation of their credits, <u>see</u> 28 C.F.R §§ 542.10-.16 (1990), and, if necessary, "seek judicial review of these computations after exhausting their administrative remedies." <u>Id.</u> Accordingly, appellant's contention of error is without merit.

**F.  Imposition of a Consecutive Ten-Year Sentence for Violation of 18 U.S.C. § 924(c)(1)**

Finally, Rosario-Rodríguez argues that he was improperly sentenced under 18 U.S.C. § 924(c)(1).  As we previously indicated, the statute provides:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime -- be sentenced to a term of imprisonment of not less than 5 years . . . .  If the firearm possessed by a person convicted of a violation of this subsection – is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years . . . .

Id. § 924(c)(1).  Here, the district court imposed the mandatory, consecutive ten-year sentence for violations involving a semiautomatic assault weapon.  We see no error in this determination.  The record establishes that on July 3, 1992 Rosario-Rodríguez was arrested with a Calico 9mm firearm capable of holding fifty rounds of ammunition.  In addition, Wilfredo Martínez-Matta testified that shortly before the murder of Richard Muñoz-Candelaria, appellant was holding an automatic pistol.  Moreover, the prosecution's expert witness, Dr. Brugal,

testified that Muñoz-Candelaria was shot twenty-nine times, which suggests that a semiautomatic weapon of some sort was employed in his murder. Accordingly, the ten-year mandatory sentence imposed by the district court was appropriate pursuant to 18 U.S.C. § 924(c)(1).

## XXII. Colón-Miranda's Sentence for Tampering with a Witness in Violation of 18 U.S.C. § 1512

In Counts 60 and 61 of the indictment, Colón-Miranda was charged with attempting to kill Rafael Cotto-Fuentes with the intent to prevent Cotto-Fuentes from (1) communicating with a United States law enforcement officer and (2) testifying in an official proceeding -- both in violation of 18 U.S.C. § 1512. Colón-Miranda was convicted on each count, and the district court imposed life sentences. We agree with appellant that these sentences are improper. The statute provides that in the case of attempted murder, imprisonment shall be for no more than twenty years. See 18 U.S.C. § 1512(a)(2)(B). Accordingly, we reverse and remand the sentence imposed on Colón-Miranda under Counts 60 and 61 for re-sentencing in accordance with 18 U.S.C. § 1512(a)(2)(B).

## XXIII. Ineffective Assistance of Counsel Argument Raised by Ríos-Ríos

Ríos-Ríos alleges that his trial counsel was ineffective. In this Circuit, "[w]e have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather,

must originally be presented to, and acted upon by, the trial court."
United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993); see also
United States v. McGill, 952 F.2d 16, 19 (1st Cir. 1991); United States
v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991); United States v.
Hunnewell, 891 F.2d 955, 956 (1st Cir. 1989); United States v. Costa,
890 F.2d 480, 482-83 (1st Cir. 1989); United States v. Hoyos-Medina,
878 F.2d 21, 22 (1st Cir. 1989); United States v. Carter, 815 F.2d 827,
829 (1st Cir. 1987); United States v. Kobrosky, 711 F.2d 449, 457 (1st
Cir. 1983).  It is true that we have made an occasional exception to
this rule where, for example, "the critical facts are not genuinely in
dispute and the record is sufficiently developed to allow reasoned
consideration of an ineffective assistance claim."  Natanel, 938 F.2d
at 309.  This, however, is not such a case, and therefore we decline to
review this claim.

Appellant is free to raise this argument collaterally under
28 U.S.C. § 2255.  See, e.g., United States v. Martínez-Martínez, 69
F.3d 1215, 1225 (1st Cir. 1995); United States v. Daniels, 3 F.3d 25,
27 (1st Cir. 1993).

## XXIV.  Appellants' Remaining Arguments

Appellants' remaining claims have been considered but do not
require discussion. This Court has previously stated:

> [W]e understand the practical pressure on
> lawyers--especially in criminal cases--to resolve
> doubts in favor of including doubtful claims

> along with stronger ones. But cases with
> difficult issues now crowd the dockets. At least
> in opinion writing, the court's time is best
> reserved for colorable claims.

United States v. Bennett, 75 F.3d 40, 49 (1st Cir. 1996). We reaffirm this principle today.

In addition, we decline to reach any arguments merely alluded to by appellants because "we see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." E.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). As we have previously reasoned, "[j]udges are not expected to be mindreaders," and therefore "a litigant has an obligation to spell out its arguments squarely and distinctly." Rivera-Gómez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (quotation omitted).

## CONCLUSION

For the reasons stated above, we **reverse and remand** the sentence imposed on Colón-Miranda under Counts 60 and 61 for re-sentencing in accordance with 18 U.S.C. § 1512(a)(2)(B). We reject all other arguments raised by appellants, and therefore we **affirm** appellants' convictions and sentences in all other aspects.